**UNITED STATES of America, Appellee,**

v.

**Donald J. DIEN, Sanford S. Gendler, and Michael E. Dakota, Defendants-Appellants.**

**Nos. 1080 to 1082, Dockets 79–1036, 79–1072 and 79–1075.**

United States Court of Appeals, Second Circuit.

Argued June 5, 1979.

Decided Oct. 26, 1979.

Straniere, Fagin, McKenna, Runes & Nachison, New York City, for appellant Dien.

Ronald M. Kleinberg, New York City, for appellant Gendler.

Robert I. Kalina, New York City, for appellant Dakota.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for the United States of America; Mark F. Pomerantz, Howard W. Goldstein,

Asst. U. S. Attys., New York City, of counsel.

Before OAKES and MESKILL, Circuit Judges and STEWART, District Judge.*

STEWART, District Judge:

Donald J. Dien, Sanford S. Gendler and Michael E. Dakota appeal from judgments of convictions entered in the United States District Court for the Southern District of New York following the acceptance by District Judge Charles L. Brieant, Jr. of their pleas of guilty to the second count of a three-count indictment. Count one charged the appellants with conspiring to distribute and to possess with intent to distribute marihuana, 21 U.S.C. § 846 and Count two with the distribution of and possession with intent to distribute 158 pounds of marihuana on June 27, 1978, 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2. Count three charged appellant Dakota with the possession with intent to distribute an additional 142 pounds of marihuana on June 27, 1978, 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(B). The government consented to the preservation of each of the defendant's right to appeal the denial of his suppression motions and the denial of the motion to dismiss the indictment. *See, United States v. Isom,* 588 F.2d 858 (2d Cir. 1978). On appeal, appellants also challenge the sentences imposed upon them by Judge Brieant.

**I.**

Following the return of the indictment and prior to the entry of the guilty pleas, each defendant moved for an order suppressing the physical evidence seized, and the statements made, at the time of his arrest. A suppression hearing was held on September 5, 6, 11 and 12, 1978 and from the evidence adduced at that hearing Judge Brieant found that the following series of events took place. Beginning in mid-May 1978, Agent John DiGravio of the United States Drug Enforcement Agency ("DEA"), directly and through two informants with whom he had worked previously, Louis Soper and Carol Clifford, received information from Betty Dien, wife of appellant Donald Dien, that her husband was involved in a large scale marihuana distribution operation in Manhattan, the merchandise being transported in rented vans. DiGravio independently verified some of the information he received from Mrs. Dien. On June 27, 1978 DiGravio was informed by Soper that Donald Dien and another individual, at that time unidentified, would be proceeding from Dien's residence to pick up a large quantity of marihuana. The source of Soper's information was Betty Dien. DiGravio went to Dien's address about mid-day where he observed Dien "pacing" on the sidewalk in front of his apartment building. DiGravio observed a rented Hertz van, driven by a person later identified as Sanford Gendler, stop and pick up Dien. DiGravio followed the truck to the vicinity of 262 Fifth Avenue, where he observed an unidentified male, later determined to be defendant Michael Dakota, assist in carrying three large cardboard cartons from 262 Fifth Avenue to the van. The van then proceeded downtown in what DiGravio considered to be an evasive manner. Although DiGravio radioed for assistance from his back-up team in the area, he decided to stop the van at a busy intersection by himself, fearing that he would otherwise lose the van in the traffic. DiGravio testified that as he walked to the van and as he asked for identification, he smelled the odor of raw marihuana emanating from inside the van and he noticed that both occupants appeared visibly shaken. At that point DiGravio told Dien and Gendler that they were under arrest. The rear of the van was locked and its contents were not visible to DiGravio. Using a key found when the defendants were searched, DiGravio opened the door and saw three large cardboard boxes each partially sealed with gray plastic tape. Other agents arrived and after questioning the defendants and photographing the van, DiGravio opened one of the cartons and found marihuana wrapped in brown

* Of the Southern District of New York, sitting by designation.

paper and secured with brown tape, surrounded by a layer of clear plastic. Later that afternoon DiGravio, accompanied by two other agents, returned to 262 Fifth Avenue, entered a loft identified as "Dakota Studios", and questioned Dakota. DiGravio, having learned from Dien that the unidentified third person who had helped in the loading of the cartons wore a gold neck chain and a pierced gold earring in his left ear, noticed that Dakota wore such a chain, and brushing back Dakota's hair he observed that Dakota was wearing the earring. A small plastic transparent bag of marihuana was visible on a work bench behind Dakota. DiGravio also noticed some gray tape and brown wrapping paper on the work bench similar to that found in the cartons in the van. DiGravio proceeded down the room past a partitioned area. Behind the partition DiGravio observed several burlap sacks which he recognized as the type commonly used for transporting marihuana. DiGravio, as he approached the sacks, could smell the odor of raw marihuana. He then ordered the arrest of Dakota and Dakota's partner Shea who had arrived during the questioning.

At the suppression hearing the defendants claimed that the arrest of Dien and Gendler had been made without probable cause and that therefore all statements and evidence obtained as a result of the arrest were inadmissible. Dakota further claimed that the seizure of the bales of marihuana and other evidence from his photo studio had been unlawful, and that the false exculpatory statements he made to the agents before his arrest were inadmissible because he had not been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

After the first day of the suppression hearing, September 5, 1978, while DiGravio was still on cross-examination, Betty Dien disclosed to her husband outside the courthouse that she had been the informant in the case. This conversation was overheard by the Assistant United States Attorney assigned to this case who, fearing for the continued physical safety of Betty Dien, sought to ascertain through agent DiGravio whether Mrs. Dien's informant status had been disclosed. He was later informed, incorrectly, that it had not been disclosed. Following the suppression hearing, but before a decision, Dien moved to dismiss the indictment. A hearing was held before Judge Brieant. Dien alleged that his wife, on her own and on the instructions of the government, passed information to the government not only as to whether or not she had disclosed her informant status to her husband but also concerning trial tactics and strategy, including information that Donald Dien would not be taking the stand, that the defense intended to dispute DiGravio's testimony with respect to the claimed evasive and circuitous driving of the van by the use of photographs and videotape and that Dakota had three witnesses available to testify at the suppression hearing. Dien also alleged that the government transmitted false information through Betty Dien to defense counsel to the effect that Dakota had decided to cooperate and testify for the government. Defense counsel contended that the government, by obtaining the information, was able to modify its strategy, and by planting the information, was able to sow discord between the defendants, and that they were prejudiced thereby and suffered a violation of their Sixth Amendment rights.

Judge Brieant held that probable cause to arrest Dien and Gendler existed when DiGravio stopped the van at the intersection even before he perceived the odor of raw marihuana emanating from the van and even before he observed the apparent nervousness of the occupants. Judge Brieant held the warrantless search of the van proper under the "automobile exception", and the warrantless search of Dakota Studios as a permissible cursory security search incident to arrest. The Court suppressed Dien's false exculpatory statements. The Court also denied the motion to dismiss the indictment finding that defendants had failed to prove that Betty Dien had transmitted any information to the government, that the prosecutor was not responsible for planting false leads in the defense camp

and that in any event defendants failed to demonstrate any prejudice. Judge Brieant concluded that, under the guidelines established in *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), appellants had not been denied their right to counsel.

## II.

█ Appellants' claims related to the motion to dismiss the indictment can be disposed of summarily. In *Weatherford v. Bursey, supra*, the Supreme Court held that to establish a Sixth Amendment violation where an informant sat in on defense strategy sessions defendants were required to establish that privileged information had been passed to the government or that the government had intentionally invaded the attorney client relationship, and resulting prejudice. Applying these standards appellants' Sixth Amendment rights were not violated even though Mrs. Dien sat in on defense meetings. Judge Brieant found, and his findings are not clearly erroneous, that the conversations alleged to have been passed on to the government were not confidential, that there was no evidence that they were in fact passed on to the government, that in the single instance where the government requested information as to Dien's knowledge of Mrs. Dien's informant status there was no improper motive nor was there any prejudice in light of the fact that Mrs. Dien gave the government false information, and that there was no evidence that the government instigated any attempt to mislead the defense in the nature of indicating that Dakota was "turning state's evidence".

Appellant Dien, on appeal, has also alleged that his Sixth Amendment right to counsel was violated because the government and the district court knew, but he did not, that there was a potential conflict of interest between him and his attorney. Dien's claim is belied by the record which indicates that on at least three occasions Dien was informed as to the potential conflict of interest yet declined to seek new counsel.

## III.

Appellants' Fourth Amendment claims are based upon their contentions that the arrests of Dien and Gendler were made without probable cause, that the warrantless search of the van and of the cartons in the van was unlawful, and that the warrantless search of the partitioned area of Dakota Studios was unlawful.

### A. *Probable Cause*

█ Appellants contend that in determining probable cause the District Court improperly considered information received from Mrs. Dien because there was no showing that Mrs. Dien or her information was reliable, *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and because the information was protected by the marital privilege. We disagree.

Judge Brieant's finding that Mrs. Dien was a reliable informant was not clearly erroneous. *United States v. Isom*, 588 F.2d 858 (2d Cir. 1978). In making this determination the trial judge could consider the relationship of the informant to the defendant. *See United States v. Sultan*, 463 F.2d 1066 (2d Cir. 1972). Furthermore, where, as here, "an informant's present information is found to be truthful by independent corroboration of the essential elements of his information [this information] can establish probable cause. . . . The corroborating evidence need not, of course, establish the crime itself; corroboration of even innocent elements is enough." *United States v. Gonzalez*, 555 F.2d 308, 313 (2d Cir. 1977). Judge Brieant's findings that Mrs. Dien was addicted to drugs, and his finding that she was not credible when testifying before him as to the alleged Sixth Amendment violations is not inconsistent with his finding that as an informant she was reliable.

As to the claim of marital privilege, Donald Dien was the only party with standing to invoke this privilege when agent DiGravio was testifying before Judge Brieant as to his communications with Mrs. Dien, *United States v. Crockett*, 534 F.2d 589 (5th

Cir. 1976), yet Dien failed to do so. Contrary to appellant Dien's contention, he could have invoked this privilege in a timely manner. The evidence clearly shows, and Judge Brieant found, that Mrs. Dien disclosed her status as an informant to her husband after the first day of the suppression hearing when agent DiGravio was halfway through his testimony. By failing to invoke the privilege, Dien waived the privilege, *Olender v. United States*, 210 F.2d 795 (9th Cir. 1954) and waived his right to raise the issue presented before us on this appeal, *United States v. Maultasch*, 596 F.2d 19, 24 (2d Cir. 1979).[1]

### B. *Search of the Van and the Cartons*

The warrantless search of the van and the seizure of the cartons was lawful. The warrantless search of those cartons however violated the Fourth Amendment.

■■■ As a general rule a search of private property must, under the Fourth Amendment, be both reasonable and performed pursuant to a properly issued search warrant. An exception to the warrant requirement, however, has been recognized, permitting the warrantless search of a motor vehicle stopped by law enforcement officers on a street or highway where the officers have probable cause to believe that the vehicle contains contraband or evidence of a crime. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed.2d 543 (1925); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Appellants nevertheless challenge the constitutionality of the search of the van, proceeding under the assumption that this "automobile exception" is based solely upon the exigent circumstances surrounding such searches—the inherent mobility of vehicles which often makes a judicial warrant impracticable—and contend that a warrant should have been required here inasmuch as the government had immobilized the vehicle at the intersection and the United States Courthouse, where a warrant could have been obtained, was only a short distance

from there. However the "automobile exception" is also based upon the diminished expectation of privacy which surrounds the automobile. *United States v. Chadwick*, 433 U.S. 1, 12, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Thus, in *Chambers v. Maroney, supra*, the Supreme Court held that the seizure of an automobile on the highway and its later warrantless search at the police station was lawful where there was probable cause for the search even though the vehicle had been immobilized and the police officers could have obtained a warrant at some later time:

> Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the "lesser" intrusion is permissible until the magistrate authorizes the "greater". But which is the "greater" and which the "lesser" intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

*Id.* 399 U.S. at 51–52, 90 S.Ct. at 1981.

As to the search of the cartons, the Supreme Court, subsequent to oral argument before us on this case, held in *Arkansas v. Sanders*, —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) that the "automobile exception" did not encompass the search of a personal suitcase found and seized in a vehicle even though the police officers had probable cause to believe that the suitcase contained marihuana. The Court, looking to the dual rationale for the "automobile exception", exigency in the form of mobility and the lesser expectations of privacy in an automobile, held that with respect to

---

1. As a result of Dien's failure to raise the issue before the District Court, the government was precluded from litigating the question of

whether or not any of the challenged communications were in fact confidential.

both there was no ·difference between personal luggage taken from an automobile and such luggage taken from other locations. *Id.* at ——, 99 S.Ct. 2586. The Court concluded that unless the warrantless search could be justified under some other exception to the warrant requirement, it would be held improper. *Id.* at ——, 99 S.Ct. 2586. As to containers other than personal luggage, the Court stated:

> Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant. *See Harris v. United States,* 390 U.S. 234, 236[, 88 S.Ct. 992, 19 L.Ed.2d 1067] (1968) (*per curiam*). There will be difficulties in determining which parcels taken from an automobile require a warrant for their search and which do not. Our decision in this case means only that a warrant generally is required before personal luggage can be searched *and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile.*

*Id.* at ——, n.13, 99 S.Ct. at 2593–94, n.13. (Emphasis added.)

 The Court's decision in *Sanders* compels our holding in this case that the warrantless search of the cartons cannot be justified under the "automobile exception". Like personal luggage there is no difference, in terms of mobility or expectations of privacy, between cardboard boxes taken from an automobile and cardboard boxes taken from other locations. The government contends that the warrantless search can be justified by other exceptions to the warrant requirement. The government argues that there was no reasonable expectation of privacy in the cartons as the contents of the cartons could be inferred from

their "outward appearance," i. e., by the odor of marihuana. The government further contends that the contents were in "plain smell" because of their odor if not "plain view" as a result of Gendler and Dien's admissions at the time of their arrest that they were transporting marihuana. We disagree. By placing the marihuana inside a plain cardboard box, sealing it with tape and placing it inside a van the windows of which had been painted over and in which plywood had been placed behind the drivers' seat, petitioners manifested an expectation that the contents would remain free from public examination. The fact that the agents detected the odor of marihuana emanating from the van did not alter this. The government's reliance on *United States v. Bronstein,* 521 F.2d 459 (2d Cir. 1975) is misplaced. In *Bronstein* we simply held that the use of trained dogs to sniff luggage to see if it contained narcotics did not itself constitute a search within the meaning of the Fourth Amendment. The case does not stand for the proposition that if the odor of marihuana is detected by a trained dog, or even by an officer, that the container may then be opened and searched without a warrant. Indeed in *Bronstein* the search of the luggage was upheld only because the defendants consented to the search. Moreover, odors from the van do not reflect upon the contents of cartons in the van since the odors could be emanating from other sources. The government's contention that the marihuana was in plain view must also be rejected. The government relies upon our decision in *United States v. Candella,* 469 F.2d 173, 175 (2d Cir. 1972). In *Candella* we held that the defendant's statement to the arresting officers that the guns they sought were in certain containers indicated to them was the equivalent of opening up the containers for the agents' inspection, rendering the guns in "plain view." Here however there is no evidence in the record that the defendants at any time stated that the marihuana was in the cartons—only that it was in the van. Thus the marihuana, which was in the cartons, was not in plain view.

██ The government contends that even if the warrantless search cannot be justified we should nevertheless not require suppression of the evidence in this case because the law in this and other circuits at the time of the search and up to the *Sanders* decision was that pursuant to the automobile exception law enforcement officers could open containers found in automobiles stopped on the highway so long as they had probable cause to believe the containers contained evidence or contraband, *United States v. Ochs*, 595 F.2d 1247 (2d Cir. 1979); *United States v. Tramunti*, 513 F.2d 1087, 1104–05 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Gaultney*, 581 F.2d 1137, 1144 (5th Cir. 1978); *but see United States v. Stevie*, 582 F.2d 1175, 1178–79 (8th Cir. 1978) (en banc), and that under the standards set out by the Supreme Court in *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975) *Sanders* should therefore not be applied retroactively. In *Peltier* the Court declined retroactively to apply its decision in *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), wherein it held warrantless border searches without probable cause unconstitutional. The Court reasoned that in *Almeida-Sanchez* it had "broadened" an existing exclusionary rule and that neither of the two primary rationales for the exclusionary rule—deterrence of unlawful police conduct and the "imperative of judicial integrity"—would be served by its retroactive application and the exclusion of evidence that the law enforcement officers, because of prior statutory, administrative and judicial interpretation, reasonably believed in good faith to be admissible. We applied the *Peltier* standards in *United States v. Reda*, 563 F.2d 510 (2d Cir. 1977). There we held that the decision in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), that although a warrantless search of a container may be permissible at the time of an arrest as a search incident to arrest it may not be permissible once the officers have reduced the container to their exclusive control, is not to be retroactively applied to searches that preceded *Chadwick*

because prior thereto there had been "ample" authority for the contrary proposition in this and other circuits. In this case, however, unlike *Peltier* and *Reda* we are not applying a decision of the court that significantly expanded the scope of Fourth Amendment protection. Rather, *Sanders* merely gave further clarity to a doctrine that was in force at least since *Chadwick*. Under *Peltier* we must determine whether the agents can reasonably be charged with the knowledge that their conduct was improper. Because the Supreme Court had previously held that "when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority," *United States v. Chadwick, supra*, 433 U.S. at 15, 97 S.Ct. at 2486, we find that the agents can be charged with such knowledge. This is clearly not an appropriate case for us to refuse retroactive application of a Supreme Court decision, and therefore the evidence obtained from the warrantless search of the cartons should have been suppressed.

### C. Search of Dakota Studio

██ Judge Brieant's findings that the agents lawfully entered Dakota's photographic studio and that they had probable cause to arrest Dakota from the moment that DiGravio recognized him as the individual who helped load the van were not clearly erroneous. Furthermore Judge Brieant correctly ruled that, because the loft appeared to the agents to be business premises, our decision in *United States v. Reed*, 572 F.2d 412, 418 (2d Cir. 1978) was inapplicable and the warrantless arrest was proper. Judge Brieant also properly held that the small bag of marihuana, the spool of gray tape, and the crumpled brown paper and brown tape were admissible under the "plain view" doctrine, *see United States v. Berenguer*, 562 F.2d 206, 210 (2d Cir. 1977). We have more difficulty however with the admission of the bales of marihuana found behind the partition. Judge Brieant declined to suppress these bales holding that

at the time DiGravio discovered them probable cause existed for the arrest of Dakota, and that in the course of making a lawful arrest on premises that appeared to the public and to the agents to be business premises the agents had the right to make a cursory examination of the room in which the defendant was arrested to see if anyone else was present who might threaten their safety or destroy evidence. We disagree. Unless there are exigent circumstances which would cause the law enforcement agents reasonably to believe that they might be in danger, warrantless security searches of the closed or concealed areas of a room in which an arrest is made, whether the premises be business [2] or residential, are not sanctioned under the Fourth Amendment.[3] Exigent circumstances may exist where the agents have information that the individual arrested is travelling with other armed accomplices or where the agents have reason to believe other suspects were in the apartment. *United States v. Sellers*, 520 F.2d 1281 (4th Cir. 1975); *United States v. Smith*, 515 F.2d 1028 (5th Cir. 1971). Mrs. Dien had told DiGravio, in her initial interviews with him that Dien was involved in trafficking marihuana along with "Clay", "Rick" and "George". At the time of Dakota's arrest none of these persons had been arrested. However, when DiGravio was following the van he observed only Dakota assisting in the loading of the van—no other persons were seen emerging from the building to assist even though it took Dakota three trips to bring out all the cartons. When the agents returned to 262 Fifth Avenue, DiGravio did not search the room immediately upon entering as would normally be expected if one suspected hidden accomplices. There is no basis for finding exigent circumstances since the agents had no grounds for believing, nor did their conduct indicate that they in fact believed, that there were any other persons in the studio. Therefore the warrantless search was improper and the bales of marihuana should have been suppressed.

Appellants' convictions are vacated and the case remanded for further proceedings.[4]

---

**2.** As the Supreme Court recently stated in *Lo-Ji Sales, Inc. v. New York*, —— U.S. ——, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979): " . . . there is no basis for the notion that because a retail store invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees." *Id.* at ——, 99 S.Ct. at 2326.

**3.** *See Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

**4.** In light of our holding we need not reach appellants' claims as to their sentences.