UNITED STATES of America, Plaintiff,

v.

Paul MANNINO, Michael Ardizzone, Robert Frank Romeo, Joseph Cordano, and Neil Lombardo, Defendants.

No. 79 Cr. 744 (RWS).

United States District Court,
S. D. New York.

March 28, 1980.

William M. Tendy, Acting U. S. Atty. for the Southern District of New York, New York City, by Stuart J. Baskin, Asst. U. S. Atty., New York City, for plaintiff.

Gerald L. Shargel, New York City, for defendant Mannino.

Dawson, Kimelman & Clayman, New York City, for defendant Ardizzone; Steven Kimelman, New York City, of counsel.

Fred C. Stella, Brooklyn, N. Y., for defendant Romeo.

Peter Antioco, Brooklyn, N. Y., for defendant Cordano.

## OPINION

SWEET, District Judge.

The Government has named defendants Paul Mannino, Michael Ardizzone, Neil

Lombardo, Robert Romeo and Joseph Cordano in an eleven count indictment charging possession with intent to distribute controlled substances, conspiracy to distribute controlled substances and firearms offenses. Mannino is also charged with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. Mannino and Lombardo are charged with engaging in a pattern of racketeering in violation of 18 U.S.C. §§ 1961, 1962(c) and 1963, the Racketeer Influenced and Corrupt Organizations statute ("RICO"). The filing of the present indictment and the requirements of the Speedy Trial Act have been the subject of two prior orders of this court.

Mannino and Ardizzone have now moved to suppress certain evidence seized from Mannino's automobile on September 20, 1979 and from his residence pursuant to a search warrant on September 21, 1979. Mannino moves to dismiss the RICO count under Rule 12(b)(2), Fed.R.Cr.P. The motions to suppress are granted in part and denied in part. The motion to dismiss is denied.

A suppression hearing was held on February 4 and 25, 1980 at which Mannino and four agents of the Drug Enforcement Administration ("DEA"), Agents Pavlick, Higgs, Kobell and White, testified. This opinion constitutes the court's findings of fact and conclusions of law as required by Rule 41(b), Fed.R.Crim.P.

At 6:00 p. m. on September 20, 1979, DEA Agent Silvestri negotiated a purchase of 40,000 methaqualone ("quaalude") tablets from Cordano by telephone. Cordano was then situated at the residence of Romeo at 124 Avenue T in Brooklyn. Cordano told Silvestri that he was going to "Paulie's" house to obtain the drugs.

Agent Pavlick, who was positioned outside the Romeo residence during this call, observed Cordano leave the Romeo home and followed him directly to 474 Van Sicklen Street, the residence of Paul Mannino, which Cordano entered. Cordano telephoned Silvestri, and Silvestri was able to hear "Paulie" speaking in the background. Cordano arranged to meet Silvestri at 9:00 p. m. at Cordano's residence at 2436 84th Street in Brooklyn.

Pavlick returned to Cordano's home on 84th Street, outside which Agent Silvestri, Group Supervisor White and other agents had stationed themselves. Agents Higgs and Moser simultaneously maintained surveillance of the Mannino residence. Agent Silvestri completed negotiations for the pills inside Cordano's house. Cordano delivered 10,000 pills in a brown cardboard box to a car at the end of his block. The agents then arrested Cordano.

Approximately fifteen minutes after the arrest, Agent Moser reported to Pavlick that Ardizzone had been dropped off at the Mannino address. Mannino and Ardizzone began loading cardboard cartons into the back end of a Ford station wagon that was parked in Mannino's driveway facing out toward the street. When Mannino and Ardizzone entered the car, and Mannino started the engine, Agents Higgs and Moser pulled their car in front of the station wagon to block its departure. Agent Moser arrested Ardizzone, and Agent Higgs arrested Mannino. Agent Higgs told Mannino to get out of the car and put his hands up on a cyclone fence which ran perpendicular to the driveway. Agents Kobell and Silvestri arrived on the scene almost immediately, followed shortly by Agent Pavlick and Group Supervisor White. Silvestri placed handcuffs on Mannino. Agent Kobell assisted Agent Moser with Ardizzone, then proceeded toward Agents Higgs and Silvestri and took custody of Mannino. As Kobell escorted Mannino to the front stoop of his house, he walked by the station wagon and removed the keys.

Agent Pavlick walked around the back of the station wagon on the passenger side and noticed six or seven cardboard boxes in the rear. As he got to the driver's side, Pavlick attempted to look into a box bearing the label "Egg Pullman," which was longer than the other boxes. Some rags covered approximately half of the top of the box toward the rear of the auto. The longitudinal flaps of the cardboard box were turned outward and pressed against its sides. The

lateral flaps were pushed down at an angle on the inside of the box. Pavlick testified, "I pushed the rags off the top of the box, and I was able to see plastic bags with a white backing." With the aid of a flashlight obtained from Group Supervisor White, Pavlick could see that the bags contained pills. Pavlick stated, "I put my hand inside the box, and I pulled out one or two bags. I then went into the car itself, and I opened at least one or two more boxes with a key that I had, . . . boxes that were sealed." The other boxes also contained bags of white pills.

Pavlick and Group Supervisor White joined Agents Kobell and Silvestri on the porch where they had Mannino under control. Mannino asked to be taken into the house in order to avoid scrutiny by a group of fifteen or twenty neighbors which had gathered on the street in front of the Mannino residence. The agents removed the handcuffs so that Mannino could enter the house and subdue a guard dog which was barking inside. After Mannino chained the dog, the cuffs were replaced, and he was seated at the kitchen table.

Agents Pavlick and Kobell proceeded to make a cursory search for individuals on the interior of the house. During this cursory search, Kobell and Pavlick observed a loaded sawed off shotgun in the bedroom and a safe in the basement.

Recalling that he possessed the keys to the station wagon, Kobell left the house to secure it. Leaning against the back of the front seat of the automobile, he observed a white plastic bag within which he discovered a ledger book and four loaded handguns. The ledger book contained a detailed record of a large number of drug transactions extending over a period of several years.

On the basis of this evidence, Agent Pavlick applied for a search warrant of the Mannino residence on September 21, 1979. The warrant was granted, and a search of the residence, which had been secured by DEA agents overnight, was conducted. The search yielded over $45,000 cash and incriminating documentary evidence.

In reaching these factual findings, the court has taken note of certain discrepancies among the testimony of the four DEA agents. The only significant discrepancy was between the testimony of Agents Higgs and Kobell. Higgs testified that shortly after the arrest of Mannino, Agent Kobell searched the front seat of the station wagon and discovered the plastic bag containing weapons, which he showed to her. Kobell testified that he did not search the car until after entering the house, approximately fifteen minutes after the arrest, and denied showing the contents of the bag to Agent Higgs. However, this discrepancy in testimony has no legal significance. In view of the rapid and fluid unfolding of events at 474 Van Sicklen, small differences in testimony are inevitable. Kobell testified in a frank and credible manner and the agents corroborated each other in all pertinent respects. The disparities in testimony strengthen, rather than detract from, the impression of credibility.

Mannino's testimony contradicted that of the DEA agents in several significant respects. The contradictions will be discussed in ruling upon the various points of law raised by this motion.

A. *Seizuere of the Pills in the "Egg Pullman" Box*

■ Mannino contends that the seizure of the pills from the "Egg Pullman" box violated his Fourth Amendment rights. He claims that once the DEA agents gained control of the station wagon and its contents, they were required to obtain a search warrant before opening any of the boxes. Mannino relies on *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), and *United States v. Dien*, 609 F.2d 1038 (2d Cir. 1979), *aff'd on motion for reh.*, 615 F.2d 10 (2d Cir. 1980). The Government urges that the search falls within the "automobile exception" to the warrant requirement of the Fourth Amendment.

In *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Supreme Court held that the search of an automobile in which a robbery suspect had

been riding and the seizure of two revolvers without a warrant did not violate the suspect's Fourth Amendment rights. The Court emphasized that the police had had probable cause to arrest the suspect and to believe that the automobile contained incriminating evidence. Because of the inherent mobility of an automobile and the diminished expectation of privacy associated with automobiles, the warrantless search of the automobile was permissible, so long as probable cause existed for the search.

In *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the Court carefully delimited the scope of the "automobile exception." There the police seized a locked footlocker from the open trunk of an automobile before the automobile had been started. The police searched the footlocker over an hour after seizure of the locker and the arrest of the suspected drug traffickers. The Court held that despite the existence of probable cause to believe that the footlocker contained illegal drugs, the search contravened the Fourth Amendment. The search did not fall within the "automobile exception," since at the time of seizure of the footlocker, it had just been placed in the trunk of the automobile, which was not running. 433 U.S. at 11, 97 S.Ct. at 2483. The Court declined to extend the "automobile exception" to personal containers such as the footlocker, since such containers lacked the inherent mobility of automobiles. Furthermore, the Court stated that "a person's expectations of privacy in personal luggage are substantially greater than in an automobile." 433 U.S. at 13, 97 S.Ct. at 2484.

In *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), the Supreme Court ruled that the "automobile exception" did not apply to the warrantless search of a personal suitcase which had been properly seized from the trunk of an automobile. The Court stressed the lack of exigent circumstances once the luggage was secured and the high expectation of privacy associated with personal luggage.

In *United States v. Dien, supra*, a panel of the Court of Appeals extended the *Sand-*

ers holding to cardboard boxes sealed with tape which were seized from the back of a locked van. The court held that since "there is no difference, in terms of mobility or expectations of privacy, between cardboard boxes taken from an automobile and cardboard boxes taken from other locations," *id.*, at 1045, the automobile exception did not cover this warrantless search.

In *United States v. McGrath*, 613 F.2d 361 (2d Cir. 1979), a different panel of the Court of Appeals, without mentioning *Dien*, held that the search without a warrant of a van and the seizure of marijuana that had been "boxed and baled" did not violate the Fourth Amendment. The court did not specify whether the boxes were sealed with tape or otherwise.

Mannino and Ardizzone contend that the testimony at the suppression hearing establishes that the pills in the "Egg Pullman" box were not in plain view. They do not claim that the search of the car itself was improper, but only that the agents had no authority to open the "Egg Pullman" box once they had secured it. The Government argues that the testimony at the hearing shows that, in contrast to *Dien*, the pills in the "Egg Pullman" box were in plain view. Second, the Government argues that even accepting Mannino's testimony that the flaps of the box were closed, suppression is not required since the box was not sealed as were the cartons in *Dien*.

Agent Kobell testified that while escorting Mannino to the stoop of his house, he passed by the station wagon and observed plastic bags containing a white substance in the "Egg Pullman" box. Kobell stated that there were no blankets over the top of the box, but indicated that there might have been some rags on top of it. Agent Pavlick stated that when he looked into the car shortly after Kobell, the flaps of the box were down against its sides and he was initially unable to see pills inside the "Egg Pullman" box. According to his testimony, as soon as he moved some rags that were covering the back half of the top of the box, he was able to see plastic bags with a white backing inside the box.

Agent. Higgs testified that after Kobell left to take Mannino to the house, she saw that two of the boxes were open, in one of which, the "Egg Pullman" carton, she was able to see plastic bags containing pills. But she did not know whether this observation occurred before or after Agent Pavlick's entrance into the auto.

Mannino testified that he packed the "Egg Pullman" box by placing newspapers over the top of the pills, then interlocking the flaps of the box to seal it. He admitted that even with the flaps closed, a large gap of approximately four inches by twelve inches would remain, but contended that the newspapers filled this gap.

Mannino's testimony concerning the care with which he packed the boxes is unlikely in view of the apparent rapidity with which the pills were loaded into the station wagon for transportation. On cross-examination Mannino could not recall whether rags had been placed over the top of the box in addition to newspapers, although he acknowledged that it was possible. He flatly denied that the "Egg Pullman" box had previously been used to store his wife's dishes, and could not explain the notation on the box, "Karen's dishes." These factors undercut Mannino's claim that he could remember precisely how the box was packed.

However, even if Mannino's testimony were accepted on this point, suppression still would not be required. Mannino made no claim that the "Egg Pullman" box was sealed with tape or otherwise, as were the cartons in *Dien*. According to Pavlick, he could perceive the pills in the box as soon as he moved some rags which were sitting over the back half of the top of the box. Even if Mannino's recollection of the condition of the box were credited, Pavlick would have had to do no more than push aside some newspapers which were sitting on top of the pills to find them. Neither *Sanders* nor *Dien* circumscribed the "automobile exception" so narrowly as to prevent an agent from looking under rags or pushing aside newspapers in order to discover contraband.

The case closest to this on the facts is *United States v. Neumann*, 585 F.2d 355 (8th Cir. 1978), in which a closed, but unsealed, department store box was seized from the front seat of an automobile and searched without a warrant. The court held:

> There is simply an insufficient expectation of privacy in an unsecured cardboard box sitting in plain view in the passenger compartment of an automobile. The arresting officers merely lifted the lid of the box and discovered a large quantity of pills.

*Id.* at 360–361. Since the officers had probable cause to believe that the box contained illicit drugs, the search was upheld under the automobile exception. The Supreme Court's subsequent ruling in *Arkansas v. Sanders*, which involved the search of a personal suitcase seized from the trunk of a car, would not have compelled a different result in *Neumann*.

Mannino had no reasonable expectation of privacy in an unsealed cardboard box, whose interlocked flaps left a gap of approximately fifty square inches, and whose contents were hidden from plain view only by some rags or newspapers. The prior events of the evening gave the agents ample cause to believe that the cardboard "Egg Pullman" box contained controlled substances. As in *Neumann* and *McGrath*, the search of the "Egg Pullman" box was reasonable and did not violate the Fourth Amendment.

## B. *The Search of the Sealed Boxes*

Mannino testified that of the remaining cartons in the back of the station wagon, three were packed like the "Egg Pullman" box with newspapers and interlocked flaps. Three others were sealed with tape on both the top and the bottom. All six of these boxes were identical in appearance to that seized from Cordano earlier in the evening. Agent Pavlick admitted opening one or two boxes that were sealed with tape. No warrant was ever obtained to open the remaining boxes containing pills.

The contents of the boxes whose flaps were merely interlocked will not be

suppressed; as with the "Egg Pullman" box, this makeshift method of closing the boxes did not afford Mannino a reasonable expectation of privacy in their contents. The discovery of pills in the "Egg Pullman" carton, coupled with the resemblance between the remaining boxes and the box seized from Cordano, strongly indicated that these unsealed cartons contained illicit substances.

■ The Government urges that the agents were also entitled to search the sealed boxes without a warrant, because "their contents could be inferred from their outward appearance." *Arkansas v. Sanders, supra*, 99 S.Ct. at 2593 n.13. Yet, the fact that the agents had ample cause to believe that the sealed boxes contained pills does not mean that their contents were apparent from the exterior. In this case the plain brown cardboard exteriors of the boxes provided no hint as to their contents. In fact, Mannino testified that not all the boxes in the back of the station wagon contained pills. The application of the "automobile exception" turns not on probable cause, but on whether the presence of the boxes within the automobile increases the need for a warrantless search or decreases the expectation of privacy in them. *See Arkansas v. Sanders*, 99 S.Ct. at 2593; *United States v. Dien*, 609 F.2d at 1044. Neither factor was altered by the fact that the secured boxes were in the station wagon. In view of the rapid development of events following Mannino's arrest, the distinction between boxes whose flaps are interlocked and those sealed with tape is indeed narrow. Nevertheless, *Dien* compels the suppression of the contents of those boxes which were sealed with tape.

C. *Seizure of the Guns and Ledger from the White Plastic Bag*

■ Mannino and Ardizzone contend that the agents were required to obtain a search warrant before opening the white plastic bag on the front seat of the automobile and therefore that seizure of the items contained in that bag was improper. Mannino testified that the ledger book and the guns were placed inside the brown paper bag, which was folded shut and placed inside an opaque, white plastic bag. Mannino claimed that the plastic bag was itself folded shut and was sitting on the front seat of the station wagon. Agent Kobell testified that the white plastic bag was leaning against the back of the front seat and that the ledger book was protruding from the top of the white bag. When he removed the book from the white plastic bag, he saw the brown paper bag inside. Because of the weight and the shape of the items in the brown bag, he became aware that it contained guns. Upon opening the bag, he found the four loaded handguns.

Even if the bags were folded shut, as contended by Mannino, the agents were justified in opening the bags to determine their contents. Several courts have declined to suppress items seized without a warrant in similar circumstances. *See United States v. Diaz*, 577 F.2d 821 (2d Cir. 1978) (wet paper bag seized from toilet); *United States v. Gooch*, 603 F.2d 122 (10th Cir. 1979) (plastic bags seized from airplane); *United States v. Neumann*, 585 F.2d 355 (8th Cir. 1978) (unsealed department store box). The plastic bag was unsealed and was placed in direct view on the front seat of the automobile. Mannino and Ardizzone had no reasonable expectation of privacy in these bags. *See also United States v. McGrath, supra* (boxed and baled marijuana). Further, in view of the discovery of pills in the back of the car and a sawed off shotgun in Mannino's house, Agents Kobell and Higgs had probable cause to believe that the plastic bags contained either controlled substances or handguns. Therefore, the warrantless search of the white plastic bag was not improper.

Once Kobell had removed the brown paper bag from the plastic bag, the weight and shape of the bag indicated to him that it contained handguns. Since the contents of the paper bag were apparent from the outside, Kobell was entitled to search the bag. *See Arkansas v. Sanders, supra*, 99 S.Ct. at 2593 n.13; *United States v. McGrath*, supra; *United States v. Diaz, su-*

*pra,* 577 F.2d at 824. The motion to suppress the ledger book and the handguns contained in the bags is denied.

### D. *The Cursory Search of the Mannino Residence*

■ Mannino urges that the DEA agents had no authority to enter his house, and that even if they did, they had no right to conduct a cursory search of the house. The Government claims that Mannino requested that he be taken into his house and that, having done so, the agents were entitled to look around the house to assure that no other persons were present.

All four agents testified that Mannino requested to go into his house in order to avoid being seen by a group of neighbors which had gathered on the street. Mannino testified that he could not recall whether immediately after his arrest he asked to be taken inside, but could not deny that he might have done so. He stated that while on the porch of his house one agent placed the barrel of a gun against the back of his head. A few moments later, when one of the agents told Mannino that he should go into the house, Mannino consented. However, he denied requesting to enter his house while being held on the porch.

The court credits the testimony of the DEA agents on this issue. Despite Mannino's statement that he "had no reason" to ask to enter the house, in fact he had a strong reason, namely to escape the scrutiny of his neighbors who were gathering in the street. Mannino admitted that his recollection of the events following the arrest was somewhat clouded by his panic following his arrest. None of the agents was asked about the gun incident, and Mannino's recollection of this incident is rejected, particularly since a light on Mannino's porch was turned on and the events transpiring on the porch were apparently within plain view of neighbors who had gathered on the street. I find that Mannino requested to be taken into the house, that he showed the officers where his keys were, and that he secured his guard dog voluntarily and without coercion.

Having entered the house, the agents were entitled to make a rapid, cursory search of the house for possible occupants. Agents Pavlick and White testified that during surveillance of the Mannino residence prior to the arrest, several individuals had been observed entering and leaving the house. At one point two individuals departed in a Cadillac, and later another individual arrived by car. In view of this activity, the agents had substantial reason to believe that other persons might be present in the house. *See United States v. Dien, supra,* 609 F.2d at 1046–1047. The agents' check was made immediately upon entering the premises, was designed to uncover persons, not physical evidence, and was cursory in nature. This cursory search meets the guidelines set forth in *United States v. Agapito,* 620 F.2d 324 at 335–336 (2d Cir. 1980), and was not illegal. *See also United States v. Christophe,* 470 F.2d 865, 869 (2d Cir. 1972), *cert. denied,* 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1973).

### E. *Probable Cause for Search Warrant*

■ In view of the holdings above that the searches of the "Egg Pullman" box and the white plastic bag and the cursory search of the Mannino residence were proper, the Pavlick affidavit contained ample evidence to support issuance of a search warrant for the Mannino residence. *See United States v. Jackstadt,* 617 F.2d 12 (2d Cir. 1980). In making this determination, the facts contained in the affidavit have been considered without reference to the discovery of additional pills in the sealed boxes, as required by *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

### F. *Motion to Dismiss the RICO Count*

■ Section 1962(c) of the Racketeer Influenced and Corrupt Organizations statute ("RICO"), 18 U.S.C. § 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

**516**

a pattern of racketeering activity or collection of unlawful debt.

"Enterprise" is defined in the RICO statute to include:

> any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

18 U.S.C. § 1961(4). Mannino contends that the definition of enterprise in RICO is not intended to include an illegal enterprise such as that charged in this case; rather, Congress intended to proscribe only the conduct of legal enterprises through illegal means.

The Court of Appeals rejected this precise argument in *United States v. Altese*, 542 F.2d 104 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977). The interpretation of "enterprise" urged by Mannino has also been rejected by the Third Circuit, *United States v. Manchester*, 605 F.2d 1198 (3d Cir. 1979), *cert. denied*, — U.S. —, 100 S.Ct. 1344, 63 L.Ed.2d 780 (1979), the Fifth Circuit, *United States v. Morris*, 532 F.2d 436, 441–442 (5th Cir. 1976), the Seventh Circuit, *United States v. Cappetto*, 502 F.2d 1351, 1358 (7th Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975); *United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979), the Ninth Circuit, *United States v. Rone*, 598 F.2d 564, 568–569 (9th Cir. 1979), and the District of Columbia Circuit, *United States v. Swiderski*, 593 F.2d 1246 (D.C. Cir. 1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2055, 60 L.Ed.2d 662 (1979).

The principal support for Mannino's position is the Sixth Circuit's well-reasoned opinion in *United States v. Sutton*, 605 F.2d 260 (6th Cir. 1979). After a meticulous examination of the legislative history and the goals of the RICO statute, that court held that it could not be used to prosecute the conduct of an illegal enterprise through a pattern of racketeering.

Although the reasoning of *Sutton* is persuasive, this court is bound to follow the precedent established by the Second Circuit in *Altese*. Under *Altese*, the fact that the enterprise in which Mannino engaged was

itself illegal would not preclude prosecution of Mannino under the RICO statute. The motion to dismiss Count Eleven of the indictment is denied.

For these reasons, the motion to suppress the pills contained in sealed cartons is granted, and all other motions are denied. Barring a transit strike, the trial will commence on April 1, 1980.

IT IS SO ORDERED.