## Richmond

JAMES RAY ABELL

V.

## COMMONWEALTH OF VIRGINIA

November 26, 1980.

Record No. 800354.

Present: All the Justices.

FREDRICK LEE HOLSHOUSER

V.

## COMMONWEALTH OF VIRGINIA

November 26, 1980.

Record No. 800355.

Present: All the Justices.

*Michael Morchower* (*John W. Luxton; Morchower & Associates,* on brief), for appellants. (Records Nos. 800354 and 800355).

*James E. Kulp, Deputy Attorney General* (*Marshall Coleman, Attorney General,* on brief), for appellee. (Records Nos. 800354 and 800355).

COCHRAN, J., delivered the opinion of the Court.

James Ray Abell and Fredrick Lee Holshouser were indicted for possession of cocaine on or about September 1, 1978, with intent to distribute the controlled drug. Each filed a motion to suppress the contraband as the product of an unlawful search and seizure. After conducting a joint hearing on June 7, 1979, the trial court overruled

the motions. Abell and Holshouser pleaded not guilty and were tried by the court, sitting without a jury, on the evidence presented at the suppression hearing, subject to their continuing objection to the admissibility of the contraband. The court, finding both guilty as charged, entered judgment orders on December 5, 1979, sentencing each to serve 20 years in the penitentiary, with 10 years suspended.

On appeal, Abell and Holshouser challenge the validity of the warrantless search by the police of a locked attaché case in the trunk of an automobile and the seizure of cocaine discovered therein. They also contend that the evidence was insufficient as a matter of law to prove that they had knowledge of the contraband.

At the suppression hearing, only two witnesses testified, L. C. Foster, Jr., and Lloyd O. Gwaltney, both employed by the Department of State Police in the investigation of narcotics cases, Foster for six years, Gwaltney for one year. About August 15, 1978, both were ordered with other investigators to maintain a continuing 24-hour surveillance of James Steinman, a Richmond resident who was suspected of being a drug dealer. An informant had reported that he had purchased quantities of drugs from one of Steinman's lieutenants, but had been unable to make contact with Steinman. Pursuant to a court order, the police were intercepting Steinman's telephone calls.

On September 1, 1978, the officers learned, through an intercepted telephone conversation, that Steinman was leaving his apartment to meet someone at another location. Members of the investigating team followed him and a female companion, Debra Barrack, to Apartment 703-D of the Sturbrook Village Apartments. Foster parked where he could keep the parking lot of the apartment complex under observation, and Gwaltney stationed himself where he could observe the apartment that Steinman and the woman entered. Gwaltney told Foster that he had been informed a year and a half or two years previously that "a right good-size drug dealer" named Abell, whom police had never been able "to get", lived in one of the apartments.

Foster testified that about 1:15 p.m. he observed a green Mercury, driven by a man later identified as Holshouser, pull into the parking lot. Checking the license number, Foster ascertained that the vehicle was owned by Abell, whose address was listed as Apartment 703-D, Sturbrook Village Apartments. Although Foster could not see where the driver went, he received a radio message that the man entered Apartment 703-D. About 1:20 p.m., a Mercedes arrived in the parking lot. The driver remained in the car for as long as 30 seconds looking in all directions, got out, looked over the parking lot, and, as

Gwaltney reported to Foster, went into Apartment 703-D. A license check revealed that the Mercedes belonged to a man named Traina, who another officer said was "supposed to be" an associate of one Robert Ring. Foster concluded that the driver of the Mercedes was probably Ring.

At 1:23 p.m., Gwaltney radioed Foster that Ring and a man later identified as Abell had left the apartment. They came into Foster's view as they walked to the rear of the Mercedes. Opening the trunk of the car, Ring removed a brown 8″ x 11″ manila envelope and handed it to Abell. After opening the envelope and peering inside, Abell returned it to Ring. Both men turned towards the apartment, where Steinman was looking out the window, and waved. Foster saw no sign given by Steinman acknowledging these gestures. Ring removed from the turnk a brown attaché case which he delivered to Abell before driving the Mercedes from the premises. Abell, case in hand, walked towards the apartment.

At 1:45 p.m., Foster saw Holshouser return to the Mercury with what appeared to be the same brown attaché case. Holshouser placed the case in the trunk of the car, removed an unidentified black object, shut the trunk, and walked in the direction of the apartment. Five minutes later, Steinman and his girlfriend departed in a blue Plymouth.

Abell and Holshouser departed in the Mercury at 2:20 p.m., with Holshouser driving and Abell riding in the passenger seat beside him. Having decided to stop and search the vehicle, the investigating team arranged to have troopers stationed on Route 60 to give whatever assistance might be required. Foster, Gwaltney, and Investigator Barrett of the State Police followed the car as it proceeded to Route 60, continued a short distance on that highway, turned into an intersecting street, and parked in a private driveway at Holshouser's residence on Robious Road. The investigators stopped behind the Mercury, informed Holshouser that they believed he was transporting narcotics, and requested permission to search the vehicle. Although both Holshouser and Abell refused to consent to a search, Barrett removed the keys from the ignition and unlocked the trunk. He discovered that the brown attaché case inside the trunk was locked. When neither Holshouser nor Abell would disclose the combination to the lock, Barrett used a screwdriver to force open the case, which contained cocaine in manila envelopes. Seizing the contraband, the officers arrested both men.

Trooper Gwaltney corroborated Foster's testimony. He observed Steinman and his girlfriend enter Apartment 703-D. He watched as

Abell and Ring looked into the trunk of the Mercedes, turned towards the apartment, and raised their hands in the air. He saw Abell carry a brown attaché case into the apartment, and, looking through the apartment window, he saw Abell and Steinman make several telephone calls. After Steinman and his female companion departed, Gwaltney saw Holshouser, accompanied by Abell, carry the brown attaché case from the apartment, place it in the trunk of the Mercury, and drive away in that vehicle.

■ We will assume, without deciding, that the officers had probable cause to believe that Abell and Holshouser were transporting controlled drugs. Such probable cause, however, must necessarily have been based upon the officers' observation of the handling of the attaché case; otherwise there was no reason for them to decide to follow the Mercury rather than the Mercedes or the Plymouth. Indeed, the wiretap, which required court approval after at least a minimal showing of probable cause under Code § 19.2-68, was directed at Steinman. Warrantless searches, of course, are *per se* unreasonable, subject to a few well-defined exceptions. *Cady* v. *Dombrowski,* 413 U.S. 433, 439 (1973). However, with probable cause to believe that the attaché case contained narcotic drugs, the officers could lawfully stop the Mercury, search it, and seize the case without a warrant. *Arkansas* v. *Sanders,* 442 U.S. 753, 761 (1979).

In *Sanders,* the officers stopped a taxi occupied by the defendant, searched the trunk, seized his unlocked suitcase, which they had probable cause to believe contained marijuana, opened it on the spot without consent and without a warrant, and found marijuana inside. The Supreme Court held that the search of the taxi and seizure of the suitcase were valid, but, in the absence of exigent circumstances, the warrantless search of the case was unreasonable. When the officers assumed exclusive control of the piece of luggage they eliminated any danger that it or the contraband could have been removed before a search warrant could be obtained. The majority opinion stated that "as a general rule there is no greater need for warrantless searches of luggage taken from automobiles than of luggage taken from other places." 442 U.S. at 763-64.

The majority, concurring, and dissenting opinions in *Sanders* referred to *United States* v. *Chadwick,* 433 U.S. 1 (1977), where police officers had probable cause to believe that a two hundred pound footlocker contained marijuana. After the defendant and his companions had lifted the footlocker into a parked car, the officers arrested them, seized the trunk, searched it an hour and a half later without a warrant,

and found marijuana. It was conceded that this was not a search within the automobile exception to the warrant requirement approved in *Chambers* v. *Maroney,* 399 U.S. 42 (1970). The Court declined, absent exigent circumstances, to extend the rationale of the automobile exception to luggage such as the footlocker, when held within the exclusive control of the police, and invalidated the search.[1] Recognizing that the diminished expectation of privacy in an automobile also provides a basis for the automobile exception, the Court held that the expectation of privacy in personal luggage, being substantially greater, does not justify the exception. 433 U.S. at 12-13.

Abell and Holshouser contend, as they did in the court below, that under *Sanders* and *Chadwick* the search of the attaché case was invalid. They say that these cases require reversal of their convictions. The Commonwealth contends on appeal for the first time that neither Abell nor Holshouser established that his Fourth Amendment rights were violated, and that *Sanders,* decided after the seizure and search of the attaché case, should not be given retroactive effect.

■ Under *Jones* v. *United States,* 362 U.S. 257 (1960), defendants charged with crimes of possession were entitled to claim "automatic standing" to move for the suppression of evidence obtained in an illegal search. This rule of law, mandated by the Supreme Court, was applicable at the time of the suppression hearing in the present case and at the time of trial, when the validity of the search was again argued. Thus, no issue was raised as to the standing of Abell and Holshouser to challenge the search and seizure. After their convictions, however, the Supreme Court expressly overruled *Jones* in *United States* v. *Salvucci,* 448 U.S. 83 (1980), to eliminate "automatic standing". The Court completed the erosion begun in *Rakas* v. *Illinois,* 439 U.S. 128 (1978), where the protection of the exclusionary rule was limited to those defendants whose Fourth Amendment rights have been violated. *See Parks* v. *Commonwealth,* 221 Va. 492, 496, 270 S.E.2d 755, 758 (1980).

---

[1] The Court explained: "Once the federal agents had seized [the footlocker] at the railroad station and had safely transferred it to the Boston Federal Building *under their exclusive control,* there was not the slightest danger that the footlocker or its contents could have been removed before a valid search warrant could be obtained. . . . With the footlocker *safely immobilized,* it was unreasonable to undertake the additional and greater intrusion of a search without a warrant." 433 U.S. at 13. (Emphasis added.)

\* \* \*

"[W]hen no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of the policy authority." 433 U.S. at 15.

*Salvucci* requires a determination not only whether the "defendant had a possessory interest in the items seized, but whether he had an expectation of privacy in the area searched". 100 S.Ct. at 2553. Since the defendants in *Salvucci* had relied upon automatic standing at the suppression hearing, the case was remanded to give them an opportunity to show that their Fourth Amendment rights were violated. Thus the burden now is upon the defendant moving for suppression of evidence obtained in a search to prove that the search was illegal, and that he had a legitimate expectation of privacy in the property searched. *Rawlings* v. *Kentucky,* 448 U.S. 98 (1980).

■ In the present case, the Commonwealth presented both witnesses who testified at the suppression hearing. Their testimony established that only Abell and Holshouser were seen carrying the attaché case and that they were the only occupants of the Mercury owned by Abell, operated by Holshouser, and followed by the officers to Holshouser's residence. The evidence further showed that both the car trunk and the attaché case were locked, and neither Abell nor Holshouser consented to the search of the trunk or revealed the combination to the lock on the case. Although we could follow the procedure of the Supreme Court in *Salvucci* and remand this case to the trial court for a hearing to determine whether the Fourth Amendment rights of either appellant were violated, we conclude that the circumstantial evidence before us establishes such violations if the search was invalid. The actions of Abell and Holshouser manifested a joint possessory interest and an expectation of privacy in the attaché case, although neither one affirmatively asserted ownership of the case or its contents. *See United States* v. *Presler,* 610 F.2d 1206, 1213-14 (4th Cir. 1979) (locked briefcases); *United States* v. *Dien,* 609 F.2d 1038, 1045 (2d Cir. 1979) (sealed cartons); *United States* v. *Schleis,* 582 F.2d 1166, 1170 (8th Cir. 1978) (locked briefcase).

■ The search of the attaché case was invalid under the principles recently articulated by the Supreme Court in *Sanders.* Once the keys were removed from the Mercury and the attaché case was seized by the officers, there were no exigent circumstances necessitating an immediate search. The mobility risk was removed, and there was no evidence of other exigencies, such as fear of explosive contents. With the attaché case within the exclusive control of the officers, there was no reason why they could not have obtained a warrant before conducting the search.

■ The Attorney General urges that *Sanders,* decided in June 1979, not be given retroactive effect to invalidate the search of September 1,

1978, in the present case. However, *Chadwick,* the forerunner of *Sanders,* was decided in June, 1977, and stated the controlling principle that in the absence of exigent circumstances a warrantless search is unreasonable. The majority opinion in *Sanders* indicates that the Court sought in that case merely to "resolve some apparent misunderstanding" as to the application of *Chadwick* "to warrantless searches of luggage seized from automobiles". 442 U.S. at 754.

The *Chadwick* rule of "exclusive control" was applied retroactively to a pre-*Chadwick* search in *United States* v. *Schleis,* 582 F.2d 1166 (8th Cir. 1978), where the Supreme Court had remanded the case specifically for reconsideration in light of *Chadwick.* Most courts, however, in reliance on *United States* v. *Peltier,* 422 U.S. 531 (1975), in which the Supreme Court outlined the principles controlling the determination whether new constitutional doctrine may be applied only prospectively, have refused to apply the *Chadwick* doctrine to searches and seizures conducted prior to the decision in *Chadwick. See United States* v. *Stewart,* 595 F.2d 500 (9th Cir. 1979); *United States* v. *Berry,* 571 F.2d 2 (7th Cir. 1978); *United States* v. *Reda,* 563 F.2d 510 (2d Cir. 1977), *cert. denied,* 435 U.S. 973 (1978); *United States* v. *Montgomery,* 558 F.2d 311 (5th Cir. 1977).[2] Also, several post-*Sanders* decisions have refused to apply the *Chadwick-Sanders* rationale to searches performed prior to the *Chadwick* decision. *See United States* v. *Calandrella,* 605 F.2d 236 (6th Cir.), *cert. denied,* 444 U.S. 991 (1979); *Kemner* v. *State,* 589 S.W.2d 403 (Tex. Crim. App. 1979).[3] The Attorney General relied upon an unreported New Jersey case, *State* v. *Foster,* No. A-2245-78 (Super. Ct. App. Div., decided December 14, 1979), *cert. denied,* No. C-463 (N.J., filed February 27, 1980), which ruled that *Sanders* would not be applied retroactively to a pre-*Sanders* search. However, the search in issue there was a pre-*Chadwick* search.

*Sanders* has been applied retroactively to a post-*Chadwick* search by the same court that in *Reda, supra,* refused to apply the principle of "exclusive control" to invalidate a search which pre-dated *Chadwick. United States* v. *Dien,* 609 F.2d 1038 (2d Cir. 1979). The opinion explained that *Sanders* did not "significantly expand" pre-

---

[2] The Eighth Circuit, in *Schleis,* discussed the *Peltier* decision but, unlike other courts, was of the opinion that *Chadwick* "announces no new constitutional doctrine," 582 F.2d at 1174, and that it made no departure from the Supreme Court's "long-standing approach" to the warrant exceptions. *Id.* at 1171, 1173.

[3] *Kemner,* which originally held that *Chadwick* was not to be retroactively applied to a search pre-dating *Chadwick,* held on rehearing that *Sanders* did not make *Chadwick* retroactive to such pre-*Chadwick* searches. 589 S.W.2d at 410.

existing law but "merely gave further clarity to a doctrine that was in force at least since *Chadwick*". 609 F.2d at 1046. We find this reasoning persuasive and have found no authority to the contrary. Indeed, although not addressing the issue of retroactivity, another recent federal decision has invalidated under *Sanders* and *Chadwick* a search which took place before *Sanders* but after *Chadwick*. *United States* v. *Presler*, 610 F.2d 1206 (4th Cir. 1979). The Attorney General has not addressed *Dien* and *Presler* and has cited no authority for his position that the law as announced in *Chadwick* and explicated in *Sanders* should not be applied to searches conducted after the date of the *Chadwick* decision, as this one was.

The Attorney General argues that in searching the attaché case the officers were relying upon *Chambers* v. *Maroney*, 399 U.S. 42 (1970), *Carroll* v. *United States*, 267 U.S. 132 (1925), and *Westcott* v. *Commonwealth*, 216 Va. 123, 216 S.E.2d 60 (1975). But all of these cases were decided before *Chadwick*. See *United States* v. *Dien, supra,* 609 F.2d at 1046, where the Court held that police officers were charged with notice of *Chadwick* in conducting a warrantless post-*Chadwick* search of sealed cartons seized from a van.

Finally, the Attorney General urges that we restrict the application of the exclusionary rule by declining to exclude evidence obtained in an invalid search where the Commonwealth can show that the officers acted in a reasonable, good-faith belief that their actions were proper. He cites *United States* v. *Williams*, 622 F.2d 830 (5th Cir. 1980) as authority for this proposal.

*Williams* is an unusual case. Sixteen members of the 24-judge court, sitting *en banc,* held that an arrest was valid, that searches of the person and luggage of the defendant incident to the arrest were valid, and that contraband seized was admissible in evidence. Thirteen members of the court, including some of those who comprised the majority in the first holding, united in an alternative holding that, even if the arrest was invalid, the exclusionary rule would not be applied because the officer was operating under a good-faith and reasonable belief that he had authority to make the arrest. This "second majority", in an opinion noting widespread dissatisfaction with the exclusionary rule, which often enables guilty persons to escape conviction when police officers have improperly obtained incriminating evidence, stated that thereafter in that circuit a good-faith exception would be applied. The proponent of evidence sought to be excluded because of police conduct will have the burden of showing that the conduct, if mistaken or un-

authorized, was taken in a reasonable, good-faith belief that it was proper. If the trial court so finds, it shall not exclude the evidence.

The exclusionary rule was established by the Supreme Court in *Weeks* v. *United States,* 232 U.S. 383 (1914). Before the rule was made applicable to the states by *Mapp* v. *Ohio,* 367 U.S. 643 (1961), our Court had, after careful consideration, unanimously rejected it in this jurisdiction. *Hall* v. *Commonwealth,* 138 Va. 727, 121 S.E. 154 (1924). In recently restating our misgivings concerning the rule, however, we acknowledged our duty to continue to apply it "as construed from time to time by the Supreme Court". *Hart* v. *Commonwealth,* 221 Va. 283, 287, 269 S.E.2d 806, 809 (1980). Unlike *Williams,* the present case does not involve the application of the exclusionary rule to evidence obtained in a warrantless search incident to arrest. We can find no disposition on the part of the Supreme Court to permit a good-faith exception to application of the exclusionary rule in post-*Chadwick* warrantless searches of luggage. Accordingly, we are compelled to hold that the search of the attaché case was invalid under *Chadwick* and *Sanders,* and that the trial court erred in overruling the motions to suppress the evidence thereby obtained.

For the reasons assigned, we will reverse the judgments of the trial court and remand the cases for such further proceedings as may be required consistent with this opinion.

*Reversed and remanded.*