William Harris SHARPE, Appellant,

v.

UNITED STATES of America, Appellee.

Donald Davis SAVAGE, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 79–5314, 79–5315.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 8, 1981.

Decided Sept. 4, 1981.

Rehearing and Rehearing En Banc
Denied Dec. 18, 1981.

Mark J. Kadish, Atlanta, Ga. (Rhonda A. Brofman, E. Marcus Davis, Kadish, Davis & Brofman, P. C., Atlanta, Ga., Larry Turner, Dennis E. O'Neill, Burkett, Wooddy, Bargmann & Cisa, Charleston, S.C., Edward T. M. Garland, Garland, Nuckolls & Catts, P. A., Atlanta, Ga., on brief), for appellants.

Lionel S. Lofton, Asst. U. S. Atty., Charleston, S.C. (Thomas E. Lydon, Jr., U. S. Atty., Columbia, S.C., on brief), for appellee.

Before WINTER, RUSSELL and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

William Sharpe and Donald Savage were indicted for possession with intent to distribute a controlled substance (marijuana) under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.[1] At the hearing on the motions to suppress, which was conducted during the bench trial of these charges, Sharpe and Savage challenged the admission of certain evidence as the fruit of unlawful searches and seizures in violation of the Fourth and Fourteenth Amendments. The district court denied the motions and consequently found them guilty under the above statutes. We find the denial of the motions to suppress to be error and reverse.

I.

On June 9, 1978, Luther Cooke, an agent with the Drug Enforcement Administration (DEA), on patrol in an unmarked car along the coast of North and South Carolina, an area under surveillance for suspected drug trafficking, spotted a pickup truck with an attached shell camper, followed by a Pontiac. Observing that the truck was riding low in the rear and appeared overloaded, and that a quilted material covered the rear window of the camper, Cooke proceeded to follow the vehicles south. After approximately twenty miles, Cooke determined that he would make an investigatory stop of the vehicles, and he dispatched a request for aid, to which South Carolina Highway Patrolman Thrasher responded.

Some time after Thrasher joined the procession, the Pontiac and the truck turned onto a loop road through a campground. At no time prior to the turn had the occupants of the truck or vehicle signalled to or communicated with each other, and they did not attempt to do so as they drove the loop road through the campground. Thrasher later testified, however, that the truck and Pontiac were speeding as they drove along that road. At the end of the loop, the vehicles turned back onto the main coastal highway and again proceeded south toward Myrtle Beach.

Shortly thereafter, Cooke stopped the Pontiac and Thrasher stopped the truck. Cooke approached the Pontiac's occupants and identified himself. He requested and received an operator's license from the driver, Sharpe; the license was in the name of Raymond J. Pavlovich. Sharpe and his passenger Davis (the charges against whom

---

1. 21 U.S.C. § 841(a)(1) states that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

18 U.S.C. § 2(a) directs that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal," and § 2(b) states that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

were later dropped) were not told why they had been stopped. Several minutes later, Cooke radioed the local police for assistance, and two officers from the Myrtle Beach Police Department eventually arrived, in uniform and armed. Asking the local police to "maintain the situation," Cooke turned custody of Sharpe and Davis over to them and left to join Thrasher, who was with the truck a few blocks further south.

After stopping the truck, Thrasher had approached it with his revolver drawn, had ordered the driver to get out of the truck and to assume a spread-eagle position against its side, and had searched him. At Thrasher's request, the driver had produced a Florida license identifying him as William Savage and a bill of sale for the truck in the name of Pavlovich. Thrasher gave Savage no reason for the stop but indicated that he would hold him there until Cooke arrived. Savage had then requested the return of his license and permission to leave. Thrasher had refused to return the license and told Savage that he was not free to leave, as he was under custodial arrest, and that he could detain Savage on speeding charges if necessary.

When Cooke arrived approximately fifteen minutes after the truck had been stopped, he identified himself as a DEA agent, and Thrasher handed him Savage's license and the bill of sale. Cooke twice requested that he be allowed to search the camper and was refused both times. Cooke then stepped onto the rear bumper and observed that it did not lower appreciably. He leaned against the rear of the camper, breathed deeply, and announced that he detected the smell of marijuana. Cooke removed the keys from the ignition, unlocked the camper and searched it, finding a number of highly compressed, well-wrapped burlap bales but no marijuana residue.

After the search of the camper, Cooke placed Savage under arrest and left him in Thrasher's custody while he returned to the Pontiac, where he placed Sharpe under arrest. By the time Sharpe was arrested, approximately thirty to forty minutes had elapsed since Cooke had first stopped the Pontiac.

Cooke then assembled the various parties and vehicles and led them to the Myrtle Beach police station. That evening the truck was driven to the Federal Building in Charleston, and two or three days later, Cooke supervised the unloading of the truck, which contained forty-three intact bales. Eight randomly selected bales were then searched, and analysis of samples taken from them revealed that the bales contained marijuana. No search warrant was obtained prior to the unloading and analyzing of the bales and their contents. Cooke retained two of the eight bales as evidence and stored them in a vault in his office; the rest were destroyed by fire, under the direction of the Assistant United States Attorney and without permission of the district court.

## II.

We consider first whether the vehicle stops and the detentions of Sharpe and Savage were unlawful seizures under the Fourth and Fourteenth Amendments.

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), provides that "[t]he right of the people to be secure in their persons ... and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ...." U.S.Const. amend. IV. The amendment has been construed generally to allow a law enforcement official to stop a moving vehicle without a warrant and for less than probable cause, if he has an articulable, reasonable suspicion that either the vehicle or any of its occupants is subject to seizure for violation of the law, *see Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979), and has been read in particular to allow investigatory field stops of vehicles suspected of drug trafficking, *see, e. g., United States v. Jimenez*, 602 F.2d 139, 142 (7th Cir. 1979); *United States v. Soto*, 591 F.2d 1091, 1099 (5th Cir.), *cert. denied*, 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979); *United States v. Montgomery*, 561

F.2d 875, 879 (D.C.Cir. 1977); *United States v. Garcia-Rodriguez*, 558 F.2d 956, 964 (9th Cir. 1977), *cert. denied*, 434 U.S. 1050, 98 S.Ct. 900, 54 L.Ed.2d 802 (1978).

■ Even though the reasonable suspicion standard requires less evidence of wrongdoing than does a showing of probable cause, the law does not free law enforcement officials from all restrictions concerning vehicle stops. Rather, it imposes upon them two significant requirements: first, the reasonable suspicion of illegality must not be based simply on subjective belief but must be supported by articulable and objective facts, and second, the stop must be brief. *See, e. g., United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *see also Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

We can assume without deciding that Cooke had an articulable and reasonable suspicion that Sharpe and Savage were engaged in marijuana trafficking when he and Thrasher stopped the Pontiac and the truck. We conclude, however, that the stops failed to meet the requirement of brevity.

We cannot overemphasize the importance of the brevity requirement for investigatory stops predicated upon less than probable cause; indeed, it is the transitory nature of the stop that justifies the elimination of the probable cause requirement. We note that the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), heavily relied upon the short length of a stop on the street and a frisk for weapons in fashioning an exception to the probable cause requirement. Furthermore, when the Court transposed the *Terry* stop and frisk rationale to the vehicle stop situation, it was careful to emphasize the de minimis nature of such stops in justifying the intrusion under the Fourth Amendment. In *Brignoni-Ponce*, for instance, the Court noted that the Fourth Amendment required a weighing of the public interest against the interference with individual liberty that a stop causes, and it justified the border pa-

trol investigatory stop in that case on the ground that the intrusion was "modest," usually "consum[ing] no more than one minute," and involving only "a brief question or two." 422 U.S. at 880, 95 S.Ct. at 2579–80. The Court further cautioned that "any further detention or search must be based on consent or probable cause." *Id.* at 882, 95 S.Ct. at 2580; *see also United States v. Cortez*, 449 U.S. at 416, 101 S.Ct. at 694 (denominating investigatory stops as brief).

■ The stops and detention in this case cannot be described as brief: Sharpe was detained without probable cause for arrest for thirty to forty minutes before Cooke returned to the Pontiac to arrest him, and Savage was held under custodial arrest without probable cause by Thrasher for at least fifteen minutes before being questioned and finally arrested by Cooke. Indeed, the length of the detentions effectively transformed them into de facto arrests without bases in probable cause, unreasonable seizures under the Fourth Amendment. The teaching of the recent case *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), is enlightening here. In *Dunaway*, the Court held that police violated the Fourth Amendment when, without probable cause but with a reasonable suspicion of illegal conduct, they seized an individual and transported him to the police station for interrogation. In so holding, the Court noted that Dunaway was not merely questioned briefly but was instead transported to the station for interrogation and would have been restrained if he had tried to leave; in sum, the detention "was in important respects indistinguishable from a traditional arrest," *id.* at 212, 99 S.Ct. at 2256, and, not being grounded on probable cause, it was an unconstitutional seizure.

Like the detention in *Dunaway*, the lengthy detentions of Sharpe and Savage by law enforcement officers who had no intention of allowing them to leave custody closely resembled traditional arrests. Because probable cause did not exist prior to the detentions, we must view them as illegal seizures under the Fourth and Fourteenth Amendments. *See United States v.*

*Chamberlin,* 644 F.2d 1262 (9th Cir. 1980) (twenty minute detention of individual in back of parked car, on the basis of a reasonable suspicion that criminality was afoot but without probable cause, was unlawful); *United States v. Perez-Esparza,* 609 F.2d 1284 (9th Cir. 1979) (three hour detention at border checkpoint station, including two and one-half hour delay pending the arrival of DEA agents, following valid investigatory field stop of a vehicle, constituted an illegal arrest); *see also United States v. Miller,* 546 F.2d 251 (8th Cir. 1976) (frisk for weapons following ten to fifteen minute house search pursuant to valid search warrant not valid under *Terry,* because individual was detained longer than necessary); *cf. United States v. Vasquez-Santiago,* 602 F.2d 1069 (2d Cir. 1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980) (relatively brief detention of individual in an airport on the basis of a reasonable suspicion of narcotics violation, was not an unconstitutional intrusion, the detention involving only a couple of minutes of questioning).

### III.

██ Having determined that Sharpe and Savage were illegally detained, we must next inquire whether the bales of marijuana Cooke uncovered during his search of the truck should have been suppressed as fruits of the illegality. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), provides the standard by which we test the admissibility of the incriminating evidence, the appropriate inquiry being "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. at 488, 83 S.Ct. at 417 (quoting Maguire, *Evidence of Guilt,* 221 (1959)).

We conclude that this case falls within the first category. Cooke obviously would not have had the opportunity to smell the raw marijuana, and thus would have had no reason to search the truck, had Savage not been detained for longer than constitutionally permissible under an investigatory stop. Clearly a product of Cooke's "exploitation of [the] illegality," evidence of the discovery of the bales should have been suppressed.

The government's argument that the smell of the marijuana supplied probable cause for Cooke to search the truck and thus that the evidence was properly admitted fails to persuade us that the search was constitutional. While we acknowledge that the odor of raw marijuana may provide probable cause to search a vehicle legitimately stopped, *see, e. g., United States v. Dien,* 609 F.2d 1038 (2d Cir. 1979), *aff'd on rehearing,* 615 F.2d 10 (1980); *United States v. Rivera,* 595 F.2d 1095 (5th Cir. 1979), it could not have done so in this case: Cooke's smelling the marijuana was so intertwined with the circumstances of the unlawful detentions that it could not have purged the illegal taint of those detentions and could therefore not have served as probable cause for a search. The bales thus were illegally seized, and the district court erred when it denied the motion to suppress.[2]

### IV.

██ The bales of marijuana should have been suppressed for another, equally compelling, reason: even if there had been no illegality to taint the discovery of the bales, Cooke should have obtained a warrant before allowing a search and analysis of the bales to proceed in Charleston two or three days after the stops and detentions. We find authority for our conclusion in the Supreme Court's recent decision in *Robbins v. California,* —— U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981).

The *Robbins* Court reversed a conviction for drug offenses on the ground that a warrantless search of packages of marijuana wrapped in opaque green plastic and stored in the recessed luggage compartment of a station wagon was unconstitutional.

---

2. Because we have determined that the bales of marijuana should have been suppressed, we do not find it necessary to reach the question whether the district court improperly refused to suppress Sharpe's license and the bill of sale for the truck.

Justice Stewart, in a plurality opinion joined by Justices Brennan, White, and Marshall, set forth a bright line rule that any closed, opaque container found in a vehicle during a lawful search may not be opened without a warrant. Relying on the Court's decisions in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), in which a warrantless search of a footlocker filled with marijuana and seized from the open trunk of a parked automobile was held unconstitutional, and in *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), in which the Court held that the warrant requirement applied to the search of a suitcase filled with marijuana and found in the trunk of a stopped vehicle, the plurality rejected the government's argument that a closed container in a vehicle may be subject to a warrantless search under the automobile exception. It furthermore rejected a "worthy container" rule, concluding that there is no constitutional distinction to be made among various closed containers such as suitcases, briefcases, portfolios, duffle bags, and boxes: all closed containers manifest an individual's reasonable expectation of privacy in their contents, unless a container by its very appearance betrays an illegal purpose or its contents are exposed to plain view. *See Arkansas v. Sanders*, 442 U.S. at 764–65 n.13, 99 S.Ct. at 2593–94 n.13. The plurality stressed, moreover, that the Fourth Amendment does not draw a distinction between personal and impersonal effects; as it succinctly stated, "Once placed within [a closed, opaque container], a diary and a dishpan are equally protected by the Fourth Amendment." —— U.S. at ——, 101 S.Ct. at 2846.

Joining in the judgment but not the opinion of the plurality, Justice Powell in a concurring opinion rejected the bright line rule, instead premising his conclusion that the search was unlawful on the ground that the defendant had a reasonable expectation of privacy in the carefully wrapped and sealed packages. While acknowledging the benefits of a bright line rule, Justice Powell reasoned that the plurality's rule in this case placed an unduly heavy burden on law enforcement officers to obtain warrants for the search of trivial containers.

Applying *Robbins*, we think that under either the plurality's bright line rule or Justice Powell's reasoning in concurrence, the warrantless search of the bales in the back of the truck was unconstitutional. The well-packaged bales[3] were located in the equivalent of a luggage compartment and were "closed containers" within the meaning of the plurality opinion, and, as their appearance did not manifest their contents,[4] the warrantless search was unconstitutional under the bright line rule. Sharpe and Savage, moreover, had a reasonable expectation of privacy in the bales, as evidenced by the careful packaging and sealing of the bales and the placing of them inside the curtained camper.

Cooke therefore should have obtained a warrant prior to searching the bales. Because he did not do so, the marijuana should have been suppressed on this ground, as well as on the ground that the initial seizure of the bales was unlawful.[5]

---

3. Each bale consisted of a tube of marijuana wrapped first in paper bags, then in a taped plastic bag, and finally in burlap tied with twine. Cooke acknowledged in his testimony that the marijuana was extremely well packaged.

4. Sharpe and Savage produced ample evidence of the virtual identity in appearance of the marijuana bales and bales of tobacco, cotton goods, and hemp.

5. Another ground upon which Sharpe and Savage challenge the admission of the marijuana into evidence was the prejudicial effect of the destruction of the marijuana. Because we conclude that the marijuana should have been suppressed, we do not find it necessary to decide this question. The procedure that the government followed in destroying the evidence—without defense counsel's knowledge and without leave from the district court—nevertheless seriously concerns us, as it did the district court, and compels comment.

We note that the claim of prejudice in this instance is colorable. Sharpe and Savage argue that Cooke could not have smelled the tightly packaged marijuana through the closed and well-sealed camper door. They further submit that, had forty-one of the forty-three bales not been destroyed, it would have been possible to reconstruct the conditions of the stop and then to show by scientific proof the difficulty or impossibility of smelling the mari-

## V.

Having concluded that the marijuana should have been suppressed either because its discovery was the fruit of an illegal detention, or because the warrantless search of the bales was unlawful, we reverse Sharpe's and Savage's convictions.

*REVERSED.*

DONALD RUSSELL, Circuit Judge, dissenting:

The defendants/appellants were plainly guilty. Unable to bribe their way out after being caught, they now ask this Court for protection and the majority would give such protection on the theory that the validity of a *Terry*-type stop is to be determined by the stop-watch and not by the totality of the circumstances of the stop. I cannot agree and accordingly dissent. My reasons for such disagreement are:

## I.

The Fourth Amendment preserves "[t]he right of the people to be secure . . . against unreasonable searches and seizures . . . ." The amendment does not prohibit all searches and seizures, only *unreasonable* searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960). In *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968), the Supreme Court defined "seizure": "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." As a general rule "the police must, whenever practicable, obtain judicial approval of searches and seizures through the warrant procedure . . . .", *id.* at 20, 88 S.Ct. at 1879 (citation omitted), "[b]ut we deal here with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the

beat—which historically has not been, and as a practical matter could not be, subject to the warrant procedure." *Id.*

In determining the reasonableness of the actions of the police, the *Terry* Court set forth a two part test for stopping a citizen: "Whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* For the first part of this test, the officers must be able to point to "specific and articulable facts," *id.* at 21, 88 S.Ct. at 1880, which provide "some objective manifestation that the person stopped is . . . engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). The second part, involving the conduct of the stop itself, depends on the totality of the circumstances: "The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all. . . . We need not develop at length in this case, however, the limitations which the Fourth Amendment places upon a protective seizure and search for weapons. These limitations will have to be developed in the concrete factual circumstances of individual cases." 392 U.S. at 28–29, 88 S.Ct. at 1883–84. *See also id.* at 15, 19, 88 S.Ct. at 1876, 1878. Subsequent to *Terry*, a balancing test has been used by the Court in examining the reasonableness of the search and seizure. *See, e. g., Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *Dunaway v. New York*, 442 U.S. 200, 219, 99 S.Ct. 2248, 2260, 60 L.Ed.2d 824 (1979) (White, J., concurring); *Michigan v. Summers*, —— U.S. ——, —— n.12, 101 S.Ct. 2587, 2593 n.12, 69 L.Ed.2d 340 (1981); *Pennsylvania v. Mimms*, 434 U.S. 106, 108–

juana under those circumstances. By this means, they could have attacked Cooke's credibility and the existence of probable cause to search the truck. The destruction, of course, made the simulation impossible.

The better procedure would have been for the government to have petitioned the district court for an order allowing the destruction, and

for the defendants to have received notice of the impending destruction and to have had access to the seized evidence prior to the destruction. Such a procedure ensures that defendants are not prejudiced by the government's handling of evidence. *See United States v. Heiden*, 508 F.2d 898 (9th Cir. 1974) (concurring opinion).

09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977); *Rawlings v. Kentucky*, 448 U.S. 98, 110 n.5, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878–84, 95 S.Ct. 2574, 2578–52, 45 L.Ed.2d 607 (1975); *United States v. Martinez-Fuerte*, 428 U.S. 543, 554–56, 96 S.Ct. 3074, 3081–82, 49 L.Ed.2d 1116 (1976).

The Court in the cases under review has agreed that Agent Cooke and Patrolman Thrasher had sufficient grounds for stopping Sharpe and Savage, but the majority, rather than examine the totality of the circumstances surrounding this stop, holds that an objective criterion of any investigatory stop is that it must be brief, and that the investigatory stop here was not brief. Such objective requirement has never been recognized by the Supreme Court, and I do not agree that this stop, under the circumstances, was not brief within the concept of a *Terry*-stop.

To be sure, the Court in *Brignoni-Ponce* wrote that the roving border patrol stop lasted " 'no more than a minute' " and required " 'a response to a brief question or two and possible production of a document evidencing a right to be in the United States.' " 422 U.S. at 880, 95 S.Ct. at 2579–80 (quoting Brief for United States at 25). And, in *Martinez-Fuerte*, the Court noted that the stops in the secondary inspection area lasted three to five minutes on the average. 428 U.S. at 547, 96 S.Ct. at 3078. These statements are, however, descriptive, not prescriptive, and are to be considered along with all other circumstances when evaluating the reasonableness of the search and seizure. Rather than creating a rule that the investigatory stop must be brief in some objective and absolute measure, I would hold that the Court should look at— as it must when looking at the grounds for the stop itself—the totality of the circumstances. *See United States v. Cortez*, 449 U.S. at 416, 101 S.Ct. at 694; *United States v. Bull*, 565 F.2d 869 (4th Cir. 1977), cert. denied, 435 U.S. 946, 98 S.Ct. 1531, 55 L.Ed.2d 545 (1978); *United States v. Constantine*, 567 F.2d 266, 267 (4th Cir. 1977)

(per curiam), *cert. denied*, 435 U.S. 926, 98 S.Ct. 1492, 55 L.Ed.2d 520 (1978); *United States v. Dodier*, 630 F.2d 232, 234–35 (4th Cir. 1980).

Not only do I not agree to the mechanical application of the "brief stop" rule created by the majority, I also believe that the facts of this case demonstrate that the intrusion was minimal and that such delay as there was was occasioned by the defendants themselves. DEA Agent Cooke had been following the Pontiac driven by Sharpe and the truck and camper driven by Savage for some twenty-one miles when he decided to stop the vehicles on the basis of what the majority conceded to have been "specific and articulable facts" providing some "objective manifestation ... [of] criminal activity." Before he could do so, the two vehicles, traveling in tandem for the entire distance, turned off the main road and onto a campground road where they drove fifty-five to sixty miles per hour through the thirty-five mile per hour zone, plainly attempting to elude Agent Cooke; after completing the loop, the vehicles turned back onto the main highway. Cooke meanwhile had engaged Patrolman Thrasher to help him pursue the vehicles. As they proceeded in the middle of three south-bound lanes with the Pontiac first, followed by the truck, then Cooke, and finally Thrasher in his patrol car, Cooke asked Thrasher to pull the Pontiac and truck over.[1] Thrasher moved into the left lane and pulled alongside the Pontiac and signaled him over. Then, according to Cooke:

> The Pontiac started over to the right and as he moved into the right-hand lane, Mr. Thrasher started to move over also and the Ford pickup cut between the two vehicles, between the Highway Patrol car and the Pontiac and proceeded on down the road.

Thrasher testified that as Sharpe pulled over, Savage "continued south almost hitting my car." When the Pontiac pulled over and the truck kept going, Cooke decided to stay with the Pontiac while Thrasher

---

1. Cooke was not a uniformed officer, nor was he in a marked car. After stopping Sharpe, however, he placed a flashing blue light on the dash of his car. Thrasher, on the other hand, was a uniformed officer and drove a marked car. This may account for Cooke asking Thrasher to stop the cars.

followed the truck, finally pulling it over a half mile from the Pontiac.

This ploy by Savage in the truck is the basic cause of the delay complained of by the appellants; there is no evidence of any unnecessary delay on the part of the officers. At trial Agent Cooke testified that he asked for identification from Sharpe and Mr. Davis, a passenger in Sharpe's car, and then tried to contact Patrolman Thrasher on the radio. Apparently Thrasher was out of his car because Cooke was unable to contact him for "a few minutes." Ten minutes after Cooke stopped Sharpe, officers from the Myrtle Beach Police Department arrived to remain with Sharpe while Cooke joined Thrasher and Savage.

During the time that Cooke was with Sharpe and Davis, Thrasher had checked Savage's identification and the registration on the truck. Savage produced a Florida driver's license and a bill of sale for the truck dated the day before in the name of Pavlovich. The bill of sale was from Atlanta while the truck had South Carolina plates. Savage said that the truck belonged to a friend, that it was empty, and that he was taking it to get the shocks fixed. When Cooke arrived, Savage again maintained that the truck was empty and that he was taking it on behalf of a friend to fix the shocks. At this point Cooke stepped on the back bumper and the truck did not move. It thus was obvious that the truck was heavily loaded. The officer then smelled marijuana. The truck was opened and the marijuana discovered.

Cooke testified that once he reached Savage the whole process of checking Savage's identification, stepping on the rear bumper

of the truck to see if it was heavily loaded, and smelling the marijuana took one or two minutes. Savage was then arrested and placed in the patrol car with Thrasher,[2] while Cooke returned to the Pontiac where he arrested Sharpe and Davis. (Charges against Davis were later dismissed.) It is significant that the entire process from stop to arrest took at most thirty to forty minutes—most of the time being consumed by Cooke trying to contact Thrasher by radio and Cooke traveling between the two vehicles.[3]

This is not the custodial detention found unsupportable in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In *Dunaway*, the police found the suspect at a neighbor's home and, without probable cause to arrest him, took him to the police station for questioning. Within an hour, he had made a statement. *Id.* at 203 n.2, 99 S.Ct. at 2251. The Court noted, as one of the factors in its decision to suppress the questioning and its fruits, the fact that he "was not questioned briefly where he was found," but instead "was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room." *Id.* at 212, 99 S.Ct. at 2256. Under the circumstances, it is not difficult to see that the police in *Dunaway* had clearly crossed the rational bounds of a *Terry* stop and had arrested the suspect without probable cause. Indeed, the Supreme Court concluded that "the detention of petitioner was in important respects indistinguishable from a traditional arrest." *Id.*

In contrast, here the officers conducted a *Terry* stop "by the book." They stopped

---

**2.** Savage offered $30,000 to Patrolman Thrasher if he would let him "hit the beach and run."

**3.** The thirty to forty minute delay can only be invoked in favor of Sharpe. Cooke spent ten to fifteen minutes with Sharpe and then proceeded to join Thrasher and Savage. Once Cooke reached Savage the questioning took one or two minutes, after which Cooke smelled the marijuana. Thus Savage can complain of a delay of ten to fifteen minutes, at most.

The Model Code of Pre-Arraignment Procedure § 110.2(1) (1975) suggests that an officer may "order a person to remain in the officer's presence near such place for such period as is

reasonably necessary for the accomplishment of the purposes authorized in the Subsection, but in no case for more than twenty minutes." Even under this guideline the initial stop of Sharpe was good and the stop and arrest of Savage would be good.

If we really wished to split hairs, we should subtract the time it took Savage to go the additional half mile, and get out of the truck. This mechanical hair-splitting knows no bounds. *See* Van Graafeiland, "The Second Circuit Review—1976–77 Term, Foreword—The Constitution and Numbers Game," 44 Brooklyn L.Rev. 747 (1978).

Sharpe and Savage, frisked them, and asked for identification. Agent Cooke walked to the back of the truck, stepped on the bumper, and then said he smelled marijuana. There was no abusive handling of the suspects, no prolonged questioning, and no intrusive probing into the suspects' vehicles. Furthermore, Savage had already indicated that the truck was not his and that it was empty. Thus the initial questioning of Sharpe and Savage only aroused Agent Cooke's suspicion even more—a factor we should consider. *See* 3 W. LaFave, *Search & Seizure* § 9.2 at 38, 40.[4]

This simply does not rise to the level of the unnecessary delay criticized by the Eighth Circuit in *United States v. Miller*, 546 F.2d 251 (8th Cir. 1976), or by the Ninth Circuit in *United States v. Perez-Esparza*, 609 F.2d 1284 (9th Cir. 1980), both cited by the majority. In *Miller* the police searched a house pursuant to a warrant. After finding the drugs they were searching for, the police decided to search and frisk those present including the defendant, who was a visitor in the house and had indicated a desire to leave. The search revealed a gun, and the defendant was convicted of receipt of a firearm by a previously convicted felon. The Eighth Circuit, in reversing the conviction, found that if the officers feared for their safety, the search—occurring some ten to fifteen minutes after the search began—should have been conducted when the officers first arrived. In addition, it should be noted that the search of the defendant was not related to the officers' purpose in the house, which was to search for drugs on the premises, *see Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), nor was the defendant the owner of the house. *See*

*Michigan v. Summers*, —— U.S. ——, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).

In *Perez-Esparza*, the Border Patrol, acting on a tip from a reliable informant that the defendant was smuggling drugs in his car, detained the defendant for two and a half hours until DEA agents could arrive from San Diego. The Court did not, as the majority does in this case, apply any stopwatch rule in determining the validity of the officers' action; it chose to rest its decision as I suggest we should do here, on the totality of the particular circumstances. The Ninth Circuit found that where the government had failed to justify the extreme delay, under the circumstances in the case, the defendant had been arrested without probable cause. The court specifically noted that "[w]e also do not consider whether when all officers who are competent to question a suspect are several minutes away, it is constitutionally permissible to detain a suspect briefly on less than probable cause." 609 F.2d 1284, 1287 n.2 (citing *United States v. O'Looney*, 544 F.2d 385 (9th Cir.), *cert. denied*, 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976)). The court then examined the difference in motivation behind taking a suspect to the police station for brief questioning because they cannot adequately examine him at the scene as in *O'Looney*,[5] and taking a suspect to the police station for an unnecessarily long interrogation which might just as easily have been conducted at the scene, a neighbor's house. *See Dunaway v. New York*, 422 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The court then continued:

> We do not think *Dunaway* forecloses using *Terry*-type analysis to solve such problems, when they arise in on-the-scene, unplanned, questioning. The nor-

---

4. I think that it is clear that, *Dunaway* notwithstanding, Patrolman Thrasher might have escorted Savage back to Agent Cooke, Sharpe, and the Pontiac and still been within the proper bounds of a *Terry* stop. *See, e. g., United States v. Oates*, 560 F.2d 45 (2d Cir. 1977); *United States v. Short*, 570 F.2d 1051 (D.C.Cir. 1978); *United States v. Wylie*, 569 F.2d 62 (D.C.Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978). Surely Thrasher's keeping Savage with his vehicle was the least restrictive of permissible alternatives.

5. In *United States v. O'Looney*, 544 F.2d 385 (9th Cir.) *cert. denied*, 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976), O'Looney, suspected of exporting guns to Ireland for use by the Irish Republican Army, was detained at the police station until Alcohol, Tobacco, and Firearms' agents could arrive to talk with him. The court held that "[i]t was not unreasonable to detain O'Looney temporarily at the station to await the arrival of federal officers who are more familiar with federal firearms laws and more experienced in their enforcement." *Id.* at 389.

mative distinction between *Dunaway* and *O'Looney* lies in the reasonableness of the police motivations for detaining the respective defendants.

Nevertheless, we need not reach the question whether *O'Looney* rather than *Dunaway*, should govern on the facts of the case before us, because the record does not supply sufficient police justification for the detention. There is nothing in the record to demonstrate why the Border Patrol agents stationed at the San Clemente checkpoint, who may have been experienced in drug smuggling cases, could not adequately have questioned Perez-Esparza immediately after stopping him. The record is silent as to any real justification for the two and one-half hour detention pending arrival of the DEA agents from San Diego, and the detention was thus unnecessary, even if not quite so egregious as the police conduct in *Dunaway*. Thus, as in *Dunaway*, the detention for custodial interrogation was impermissible on less than probable cause.

A similar conclusion was reached in *United States v. Richards*, 500 F.2d 1025 (9th Cir. 1974), *cert. denied*, 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975). The court stated that "[t]he test for determining the lawfulness of such police detentions is whether, under the totality of the circumstances, they are reasonable," and then found that "[a]lthough appellant's eventual detention for over an hour cannot be considered a 'brief' or 'momentary' stop, in the particular circumstances of this case we believe that this extended detention was reasonable." *Id.* at 1029. *Cf. United States v. Mayes*, 524 F.2d 803 (9th Cir. 1975) (suspect held for an hour and a half while Border Patrol agents checked out his story); *United States v. Short*, 570 F.2d 1051, 1054–55 & n.7 (D.C.Cir.1978) (suspect taken to scene of burglary for identification); *United States*

v. *Wylie*, 569 F.2d 62, 70–71 (D.C.Cir.1977) *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978) (suspect returned to bank for questioning).

These cases provide no support for the *per se* rule offered by the Court today; rather they clearly hold that we are entitled to look at all of the circumstances. Thus while an hour delay was not unreasonable in *O'Looney* or *Richards*, the fifteen minute delay in *Miller* was. Furthermore, *Miller* involved detention without "specific and articulable facts" while *O'Looney* and *Richards* involved *Terry* stops. We should also note that in *Michigan v. Summers*, —— U.S. ——, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the defendant was detained for almost fifty minutes while the police searched his house, 49 U.S.L.W. 3674 (summary of oral argument), yet the Court passed this over by saying that "[a]lthough special circumstances or a prolonged detention, might lead to a different conclusion in an unusual case, we are persuaded that this routine detention of residents of a house while it was being searched for contraband pursuant to a warrant is not such a case." —— U.S. at —— n.21, 101 S.Ct. at 2595 n.21. *Cf. Rawlings v. Kentucky*, 448 U.S. 98, 107, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980) (suspects detained for forty-five minutes while officers obtained a search warrant).

The only delay in this case was not associated with the questioning of Sharpe and Savage, but strictly with the need for Cooke to talk with both drivers. After following them for twenty miles, there could be no question that they were traveling together and, in view of Savage's stunt, there can be little doubt that they did not wish to be stopped together, if at all. Agent Cooke was experienced in dealing with suspected drug traffickers, and so it was not unreasonable for Patrolman Thrasher to hold Savage briefly until Cooke could join them.[6]

---

**6.** Analogies to *Dunaway* and the problems attendant to custodial interrogation are thus misplaced. In *Dunaway* the Supreme Court found that stops at the border were *Terry* stops in a "special context" because of the "importance of the governmental interest at stake." 442 U.S. at 210–11 n.13, 99 S.Ct. at 2255 n.13. *See*

*United States v. Brignoni-Ponce*, 422 U.S. 873, 878–81, 95 S.Ct. at 2578–80 (1975). The governmental interest at stake here is of no less importance. We can take note that while South Carolina does not have serious problems with illegal aliens, it does have a substantial problem with drug smuggling. At trial Agent

I would hold that because of the deliberate actions of Sharpe and Savage to avoid being stopped together, the brief detention of the pair was not unreasonable and therefore not a violation of the Fourth Amendment. There being no Fourth Amendment violation, I would not suppress the evidence discovered from the search and seizure.

## II.

The majority also holds that the "bright line" rule of *Robbins v. California,* —— U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981) (Plurality opinion), applies to forty-three burlap-wrapped bales each weighing about sixty pounds and containing a total of 2,629 pounds of marijuana. I cannot join the Court in such a finding, nor do I read support for such a ruling in *Robbins* or *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

The Fourth Amendment protects persons from "unreasonable searches and seizures" which invade the security of "their persons, houses, papers and effects." The Supreme Court has in turn declared that a search of a person or his property, as defined in the Amendment, without a warrant issued in conformity with the requirements of the Amendment's warrant clause is normally unreasonable and invalid *per se.* However, the Court has recognized, as an exception to the warrant requirement, that a search warrant is not necessary where there is probable cause to search an automobile stopped on a highway. *Carroll v. United States,* 267 U.S. 132, 153–54, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925).

A number of reasons have been given for this exception. While this exception has been justified on the "inherent mobility" of the automobile, which makes the procurement of a warrant impracticable, the exception's basis "lies in the diminished expectation of privacy which surrounds the automobile." *United States v. Chadwick,* 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977). "One has a lesser expectation

of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects." *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974) (plurality opinion).

Subsequent cases have followed this justification in reaching their conclusions. Thus the validity of searches of articles found in an automobile stopped on the highway has been governed by the presence or absence of a legitimate expectation of privacy in the article searched. Where there is such reasonable expectation of privacy, the Supreme Court has held that luggage which has been seized in connection with the stopping of an automobile may not be searched without a warrant. *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). The reason for such conclusion is that "luggage is a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy." *Id.* at 762, 99 S.Ct. at 2592 (relying on *Chadwick,* 433 U.S. at 13, 97 S.Ct. at 2484).

In amplifying on this reason the Court said that

a suitcase taken from an automobile stopped on the highway is not necessarily attended by any lesser expectation of privacy than is associated with luggage taken from other locations. One is not less inclined to place private, personal possessions in a suitcase merely because the suitcase is to be carried in an automobile rather than transported by other means or temporarily checked or stored. Indeed, the very purpose of a suitcase is to serve as a repository for personal items when one wishes to transport them. Accordingly, the reasons for not requiring a warrant for the search of an automobile do not apply to searches of personal luggage taken by police from automobiles. We therefore find no justification for the extension of *Carroll* and its progeny to

Cooke testified that in the two years prior to stopping the appellants, he personally had encountered "in excess of two hundred thousand pounds" of marijuana. At least three justices have also taken note of the seriousness of the

trafficking in controlled substances. *United States v. Mendenhall,* 446 U.S. 544, 561–62, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980) (Powell, J., concurring).

the warrantless search of one's personal luggage merely because it was located in an automobile lawfully stopped by the police.

*Id.* at 764–65, 99 S.Ct. at 2593–94. The Court, however, was at pains to caution that "[n]ot all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment... There will be difficulties in determining which parcels taken from an automobile require a warrant for their search and which do not." *Id.* at 764 n.13, 99 S.Ct. at 2593–94 n.13.

During the last term of Court the issue involved in *Sanders* was re-examined in two cases. In the first case the search was invalidated, *Robbins v. California*, —— U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981) (plurality opinion); in the other, decided the same day, it was sustained. *New York v. Belton*, —— U.S. ——, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). Somewhat confusingly, a majority of the Supreme Court appears to have felt that the two cases should have been decided the same way, and six members of the Court were of the opinion that *Belton* was correctly decided. *See id.* at ——, 101 S.Ct. at 2865 (Stevens, J., concurring).

The majority, of course, relies on the plurality opinion in *Robbins* for support of its conclusion. However, *Robbins* is a tenuous precedent on which to plant a decision. The opinion itself was a plurality opinion, concurred in by only four members of the Court.[7] Three members of the Court vigorously dissented. Two concurred only in the judgment. Concurring in the judgment, Justice Powell remarked on the fact that views expressed in the dissent came from the Court "late in the Term" and expressed the hope that, "[s]ome future case affording an opportunity for more thorough consideration of the basic principles at risk may offer some better, if more radical, solution to the confusion that infects this benighted area of the law." —— U.S. at ——, 101

S.Ct. at 2851.[8] Perhaps this may be such a case.

In *Robbins* the Court held that a small (about the size of a cigar box), closed, opaque container discovered when the officers "opened the tailgate of the stationwagon, located a handle set flush in the deck, and lifted it up to uncover a recessed luggage compartment," *id.* at ——, 101 S.Ct. at 2844, could not be opened without a warrant. The Court, creating a "bright line" rule, decided that a warrant will ordinarily be required before a container found in the trunk of a car may be searched. It noted two exceptions to this: No warrant is required for (1) a container which, by its very nature, reveals its contents, or (2) a container, the contents of which are exposed to "plain view." *Id.* at ——, 101 S.Ct. at 2846 (relying on *Sanders*, 442 U.S. at 764 n.13, 99 S.Ct. at 2593–94). Justice Stewart noted that the first was merely a variation of the second, "since, if the distinctive configuration of a container proclaims its contents, the contents cannot fairly be said to have been removed from a searching officer's view. The same would be true, of course, if the container were transparent, or otherwise clearly revealed its contents." *Id.* at —— – ——, 101 S.Ct. at 2846.

Neither *Sanders* nor *Robbins* supports the rule announced by the majority, that "all closed containers manifest an individual's reasonable expectation of privacy in their contents, unless a container *by its very appearance betrays an illegal purpose* or its contents are exposed to plain view." [slip op. at 972 (emphasis added)]. What the Supreme Court stated, contrary to the majority's view, was that it would be easy to identify that "some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy *because their contents can be inferred from their outward appearance,*" and that

7. *See generally*, Note, "Plurality Decisions and Judicial Decisionmaking," 94 Harv.L.Rev. 1127 (1981).

8. *See* Hutchison, "Felix Frankfurter and the Business of the Supreme Court, O.T. 1946, O.T. 1961," 1980 S.Ct. Rev. 143, 185–89 (1981).

not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment .... There will be difficulties in determining which parcels taken from an automobile require a warrant for their search and which do not. Our decision in this case means only that a warrant generally is required before personal luggage can be searched and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile.

442 U.S. at 764 n.13, 99 S.Ct. at 2593–94 n.13 (emphasis added).

If *Sanders* can be construed as holding that a container is protected only if it is "inevitably associated with the expectation of privacy," 442 U.S. at 762, 99 S.Ct. at 2592,[9] *Robbins* indicates that containers are protected unless they are inevitably not associated with an expectation of privacy. These are but alternate statements of what in effect is the same principle. Under either *Sanders* or *Robbins* Savage cannot reasonably claim to have a Fourth Amendment privacy interest in the bales of marijuana. If, as the majority notes, the bales could just as easily have contained "tobacco, cotton goods, and hemp" then it is clear that the forty-three bales—by both their nature and their number—betrayed that they did not contain personal items, but must have contained some agricultural commodity. I do not believe that even if Agent Cooke had not smelled marijuana that the bales would have been protected under a privacy theory. If, as the majority assures us these bales could have contained one of several agricultural products, I do not think that, before the public could search them, they would have to eliminate every possible commodity except marijuana—no more than they would have to know whether a gun case contained a Remington, a Winchester, or a sawed-off, home-made shotgun. Nor is it of any account to argue that the bales *might* have contained personal items, since someone might just as easily place socks,

underwear, and a toothbrush in a gun case or in a burglar's kit.

Thus the marijuana in this case was, I submit, in "plain view" or "otherwise clearly revealed." One controlling fact here is that the odor of the marijuana—over 2,600 pounds—was distinctive and clearly observable. That was sufficient to place the contents of the bales in "plain view." We held in *United States v. Haynie*, 637 F.2d 227, 233 (4th Cir. 1980), that "probable cause may be supported by the detection of distinctive odors as well as sight." In *United States v. Sifuentes*, 504 F.2d 845, 848 (4th Cir. 1974), we found that "[w]hen the police opened the door of the van, they saw the boxes and smelled a strong odor of marijuana. These facts combined to place the contraband in plain view, that is, obvious to the senses." It should be clear that the odor of marijuana provides sufficient grounds for probable cause. *See* Annotation, "Odor of Narcotics as Providing Probable Cause for Warrantless Search," 5 ALR 4th 681, 687–98 (1981) (collecting cases).

For these reasons I do not regard *Robbins* as analogous to this case. It is true that both cases are similar in that there was probable cause to search the interior of the stationwagon in *Robbins* and the truck in this case, but in this case, the bales of marijuana—forty-three of them weighing some sixty pounds each—were all stacked up in the truck, open to plain view and disclosing their character by their distinctive odor. The Court in *Robbins* was dealing with two packages brick-like in size, inside a closed opaque container, and stored in a closed luggage compartment. Moreover, there was no contention that the two bricks, stored in a container located in a recessed luggage compartment, were distinguished by odor; in this case, the evidence was ample that there was such odor. And this difference is understandable. There were at most some twenty or thirty pounds of marijuana in *Robbins*; there were one hundred times that in this case. I submit

9. *See United States v. Goshorn*, 628 F.2d 697, 700–01 (1st Cir. 1980); *United States v. Manni-*

*no*, 635 F.2d 110, 114 (2d Cir. 1980).

these factual differences would be sufficient to justify different results in the two cases.

The plurality opinion in *Robbins* did dismiss the argument that the expectation in privacy of personal effects, which is the basis for the immunity from search, is to be limited to "containers commonly used to transport 'personal effects.'" —— U.S. at ——, 101 S.Ct. at 2845. It reasoned, though, that different people used different containers to carry their "effects" such as "a closed suitcase, briefcase, portfolio, duffle bag, or box." It will be noted, though, that all the illustrations used by the plurality to support this statement relate to containers normally used to carry personal "effects" or "papers." Justice Powell in his concurring opinion draws quite a distinction between containers "such as personal baggage, ... inevitably associated with the expectation of privacy," and others which "consistently lack such an association." —— U.S. at —— n.3, 101 S.Ct. at 2850 n.3. In dissent, Justice Blackmun perceived the same difficulty in determining what articles, under the plurality's test, could or could not be validly searched without a warrant, as had Justice Powell. He suggested that "only time will tell whether the 'test,' ... for determining whether a package's exterior 'announce[s] its contents' will lead to a new stream of litigation." *Id.* at ——, 101 S.Ct. at 2851 (citation omitted).

*Arkansas v. Sanders* would confine the rule relied on by the majority to articles which are "inevitably associated with an expectation of privacy." That at least is the way Justice Powell, the author of the opinion in *Sanders*, indicated in his concurring opinion in *Robbins* the opinion in *Sanders* should be construed. Assuredly there was no expectation of privacy in the bulky bales in this case, whether they be regarded as bales of marijuana, or of cotton, or of cloth. Those simply are not articles in which one has some reasonable expectation of privacy. In *Robbins*, Justice Stewart said that "[e]xpectations of privacy are established by social norms, and to fall within the second exception of the footnote in question [footnote 13 in *Sanders*], a container must so clearly announce its contents, whether by its distinctive configuration, its transparency, or otherwise, that its contents are obvious to an observer." —— U.S. ——, 101 S.Ct. at 2847. Applying this to the facts in *Robbins*, he emphasized that there was no proof "that marijuana is ordinarily 'packaged this way.'" The situation here, however, is quite different from that in *Robbins*. While marijuana may not ordinarily be packaged as in *Robbins*, the transportation of marijuana in bales such as was the case here is ordinary, particularly when large quantities of marijuana are involved. If "social norms" provide the test for determining whether articles found in an automobile enjoy an "expectation of privacy" as "repositories of personal effects," it is plain, I submit, that 2,629 pounds of marijuana, the odor of which is easily detectable, stored in a truck in forty-three bales of sixty pounds each, can hardly be considered by reasonable "social norms" to be the "repositories of personal effects." There was, in this case, no reasonable "expectation of privacy" in the marijuana and the District Court correctly so ruled.

We may add that there can be no question that Cooke had a right to open the back of the truck. Cooke smelled the marijuana from outside the truck; that gave him probable cause to search the camper. The mobility of the truck gave him the right to search it on the spot. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed.2d 543 (1925). The response adopted by Agent Cooke and Patrolman Thrasher was surely reasonable. Given that the odor of marijuana gave them probable cause to search the truck, they did not have to simply shrug their shoulders and allow Savage and Sharpe to escape, *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1922, 32 L.Ed.2d 612 (1972), while they went off in pursuit of a warrant. . And to have detained Savage and Sharpe until a warrant was secured would only have compounded the "error" (of delay) of which the majority complains.

The fact that the bales were not opened until two or three days after they were

seized is not constitutionally significant. The bales did not lose the property of "plain smell—plain view" by being transported to Charleston. The odor from the bales was just as obvious in Charleston as it was along the side of the highway. The Supreme Court stated in *Chambers v. Maroney*, 399 U.S. at 52, 90 S.Ct. at 1981: "For constitutional purposes, we see no difference between, on the one hand, seizing and holding a car before presenting the probable cause issue to a magistrate and, on the other hand, carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." This view from *Chambers* has been followed in other cases involving automobiles, *Cardwell v. Lewis*, 417 U.S. 583, 595–96, 94 S.Ct. 2464, 2471–72, 41 L.Ed.2d 325 (1974) (plurality opinion); *Colorado v. Bannister,* 449 U.S. 1, 2, 101 S.Ct. 42, 43, 66 L.Ed.2d 1 (1980); *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); [10] *Texas v. White*, 423 U.S. 67, 68, 96 S.Ct. 304, 305, 46 L.Ed.2d 209 (1976) (per curiam), and in at least one case involving the defendant's personal effects. In *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), the Court held that no search warrant was required to take the suspect's clothing from him ten hours after he had been arrested:

> Surely, the clothes could have been brushed down and vacuumed while Edwards had them on in the cell, and it was similarly reasonable to take and examine them as the police did, particularly in view of the existence of probable cause linking the clothes to the crime. Indeed it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest.

415 U.S. at 806, 94 S.Ct. at 1238. The Court concluded by quoting *United States v. De-Leo,* 422 F.2d 487, 493 (1st Cir.), *cert. denied,* 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970) (footnote omitted): " 'While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.' " 415 U.S. at 808–09, 94 S.Ct. at 1239–40. *See Abel v. United States*, 362 U.S. 217, 239, 80 S.Ct. 683, 697, 4 L.Ed.2d 668 (1960).

I am not suggesting that the search of the bales in Charleston is justified under the automobile exception. The *Carroll* exception is applicable to this case only in that the mobility of the truck and the odor of the marijuana combined to give Agent Cooke probable cause and the exigent circumstances necessary to search for the marijuana he smelled without first securing a warrant. Agent Cooke had a right to open the back of the truck which then exposed

---

**10.** *Cooper* is an interesting case in point. The police impounded the defendant's car at the same time that they arrested him but did not search the car until a week later. Evidence seized during the search was introduced against him. Later cases have tried to distinguish *Cooper* on the grounds that a California statute authorized seizure of the car pending forfeiture proceedings, *e. g., Coolidge v. New Hampshire*, 403 U.S. 443, 457 n.12, 91 S.Ct. 2022, 2033 n.12, 29 L.Ed.2d 564 (1971); *see* Note, "Warrantless Searches and Seizures of Automobiles," 87 Harv.L.Rev. 835, 846–47 (1974), but the language of *Cooper* indicates that the Court did not rely exclusively on that ground:

> But the question here is not whether the search was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment.

> Just as a search authorized by state law may be an unreasonable one under that amendment, so may a search not expressly authorized by state law be justified as a constitutionally reasonable one. While it is true, as the lower court said that 'lawful custody of an automobile does not of itself dispense with constitutional requirements of searches thereafter made of it,' [234 Cal.App.2d 587, 598, 44 Cal.Rptr. 483, 491], the reason for and nature of the custody may constitutionally justify the search.

386 U.S. at 61, 87 S.Ct. at 790–91.

The Court then distinguished *Cooper* from *Preston v. United States*, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), because the police in *Preston* searched Preston's car after he had been picked up for vagrancy; the search was not incident to the arrest.

the bales. I am suggesting that seeing the bales and smelling the odor of marijuana placed the marijuana in plain view and made obtaining a warrant to search the bales superfluous.[11] "It is no answer to say that the police could have obtained a warrant, for '[t]he relevant test is not whether it is reasonable to produce a search warrant, but whether the search was reasonable.'" *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967) (quoting *United States v. Rabinowitz*, 339 U.S. 56, 66, 70 S.Ct. 430, 435, 94 L.Ed.2d 653 (1950). Having smelled the marijuana, having seen the forty-three bales, and then arresting Savage for possession of marijuana with intent to distribute and Sharpe for conspiracy to possess marijuana with intent to distribute, it would have been a gratuitous formality for Cooke to have requested a warrant.[12]

After *Arkansas v. Sanders* the courts may have been confused over which containers were protected and which were not, *see United States v. Ross*, 655 F.2d 1159, at 1173–1174 n.3 (D.C.Cir. 1981) (en banc) Tamm, J., dissenting), but even after *Robbins* no court need be so confused as to hold that a person has an expectation of privacy in bales of marijuana weighing 2,629 pounds. The "bright line" established by *Robbins* does not apply to this case. Surely we can tell the difference between a suitcase or a green garbage bag and forty-three, sixty-pound burlap bales.

I would sustain the validity of the stop and the search and affirm the judgments of conviction.

---

11. Allowing the police to search a car without a warrant at the scene but requiring them to obtain a warrant before searching it at the station would ultimately encourage police to search the vehicle before making the arrest. Note, "Warrantless Searches and Seizures of Automobiles," 87 Harv.L.Rev. 835, 844 (1974).

12. Since a warrant was secured before the Pontiac was searched, it is obvious that Cooke was not ignorant of the procedure and was not derelict in performing his duty. Although the good faith belief of an officer will not excuse him from getting a warrant, in this case it points to the fact that Cooke believed the marijuana was in plain view. He knew exactly what he had; the only remaining inquiry was a test of the quality of the marijuana.